IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

Group One Trading LP,

        Plaintiff,

    v.

Lauren DeLuca, Lawrence Spieldenner,
John Superson and Stanton Todd,

        Defendants.

No. 07 CV 6881

Honorable Virginia M. Kendall

Magistrate Judge Susan E. Cox

# EXHIBIT A
## TO GROUP ONE'S BRIEF IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| Group One Trading LP | |
| Plaintiff, | No. 07 CV 6881 |
| v. | Honorable Virginia M. Kendall |
| Lauren DeLuca, Lawrence Spieldenner, John Superson and Stanton Todd, | Magistrate Judge Susan E. Cox |
| Defendants. | |

## DECLARATION OF JOHN GILMARTIN IN SUPPORT GROUP ONE'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

I, John Gilmartin, hereby declare:

1.     I am one of the two Chief Executive Officers at Group One Trading LP ("Group One"). The facts set forth in this declaration I know to be true of my own personal knowledge, except where such facts are stated to be based on information and belief, and those facts I believe to be true. I could and would testify competently to the matters set forth in this declaration.

### Group One Trading LP

2.     Group One is one of the largest proprietary option trading firms in the country. Group One is a limited partnership comprised in part by Group One Trading LLC, a limited liability company. Traders are employed by Group One Trading LP. Many traders are also eligible to become members of Group One Trading LLC upon being granted Units of interest in the LLC, the acceptance of which binds them to the terms of the Operating Agreement. Attached hereto as Exhibit A is a true and correct copy of Group One LLC's Operating Agreement.

3.     Headquartered in New York and Chicago, Group One LP employs over 150 people nationwide; Group One's 50-plus traders make markets in over 1900 equity and index options. Group One is a leader on five exchanges: The American Stock Exchange; the NYSE ARCA OX Exchange; the Chicago Board Options Exchange; the Philadelphia Stock Exchange;

and the International Securities Exchange. Group One also owns specialist posts on the American Stock Exchange; Philadelphia Stock Exchange; Chicago Board Options Exchange and the NYSE ARCA OX Exchange.

4.     As a privately held trading group, Group One's business consists of trading 100% of its own capital. As market makers, Group One seeks to provide liquidity while spreading risk and taking advantage of economies of scale.

5.     As one of the two Chief Executive Officers, I primarily work in the Philadelphia and New York offices, but oversee operations in offices throughout the country.

6.     As one of the leading options trading firms in the country, Group One invests substantial time and money into developing its traders from the ground-up. For example, most traders who work at Group One started out as trade support staff who then underwent the rigorous Group One Training Program to become a full-fledged trader. Group One derives a distinct competitive advantage in the option trading market by cultivating its own traders through its innovative Training Program, internally developed and designed to impart both general knowledge about option trading as well as concepts and techniques unique to Group One's trading practices. The Training Program—which takes the average trader over one-year to complete—allows Group One to develop highly knowledgeable traders who are also well adapted to Group One's culture and fast-paced environment through mock floor trading sessions.

## Defendants' Misappropriation of Group One's Confidential and Proprietary Trade Secret and/or Copyrighted Information

7.     I am informed and believe that former Group One employees Lauren Deluca, Lawrence Spieldenner, John Superson, Stanton "Cory" Todd, and John Petrizzo misappropriated and/or were complicit in misappropriating Group One confidential copyrighted information, trade secrets, and other confidential information just prior to terminating their employment with Group One.

8.     Before their departure, all of the defendants worked as traders at Group One.

Deluca, Spieldenner, Superson and Todd worked in the Chicago office of Group One.  Petrizzo worked in the New York office of Group One, but traded remotely.

9.    Defendant Lawrence Spieldenner began employment with Group One on July 17, 2000 as a trader in the Chicago office.  Spieldenner signed an employment agreement on April 11, 2001.  Attached hereto as Exhibit B is a true and correct copy of Spieldenner's employment agreement.  On October 1, 2005, Spieldenner was awarded a number of Restricted Units to Group One's LLC and effectively became a member of the LLC on that same day.  Attached hereto as Exhibit C is a true and correct copy of Spieldenner's signed Restricted Unit Agreements for 2005 and 2006, binding him to the terms of the LLC's Operating Agreement.

10.    Spieldenner had access to Group One's copyrighted, trade secret and confidential information on a need to know basis only.  Spieldenner voluntarily terminated his employment with Group One on Friday, November 16, 2007.  On that same day, I am informed and believe that Spieldenner informed my co-CEO, Ben Londergan, of his termination and that he intended to go into options trading on his own.  Spieldenner did not give prior notice of his resignation.

11.    Defendant Lauren DeLuca began employment with Group One on July 30, 2001 as a trader in the Chicago office.  DeLuca signed an employment agreement on July 31, 2001.  Attached hereto as Exhibit D is a true and correct copy of DeLuca's employment agreement.  On October 1, 2005, DeLuca was awarded a number of Restricted Units to Group One's LLC and effectively became a member of the LLC on that same day.  Attached hereto as Exhibit E is a true and correct copy of DeLuca's signed Restricted Unit Agreements for 2005 and 2006, binding him to the terms of the LLC's Operating Agreement.

12.    DeLuca had access to Group One's copyrighted, trade secret and confidential information on a need to know basis only.  DeLuca voluntarily terminated his employment with Group One on Friday, November 16, 2007.  On November 15, 2007, I am informed and believe that DeLuca verbally informed Mr. Londergan that DeLuca was resigning the next day.  I am informed and believe that DeLuca told Londergan that he had no concrete plans to trade equity options.  Declua did not give prior notice of his resignation.

13.     Defendant John Superson began employment with Group One on June 1, 1998 as a trader in the Chicago office. Superson signed an employment agreement on February 7, 1999. Attached hereto as Exhibit F is a true and correct copy of Superson's employment agreement. On or about 2000 to 2001, Superson converted a number of Units interests in Group One Trading LP to Units of Group One's LLC, and effectively became a member of the LLC upon doing so. Attached hereto as Exhibit G is a true and correct copy of Superson's signed LLC membership agreement in 2002, binding him to the terms of the LLC's Operating Agreement. Also attached hereto as Exhibit H is a true and correct copy of Superson's signed Member Consent to Amendment No. 4 of the Operating Agreement.

14.     Superson had access to Group One's copyrighted, trade secret and confidential information on a need to know basis only. Superson terminated his employment with Group One on Friday, November 16, 2007. I am informed and believe that Superson entered informed Mr. Londergan in the morning that same day that he wanted to take a break from work, and then figure out what he wanted to do for a living. I am informed and believe that he explicitly said that he had not looked at options trading. Superson did not give prior notice of his resignation

15.     Defendant Stanton "Cory" Todd originally began employment with Group One on October 8, 1996. Todd terminated his employment with Group One on February 18, 2003, but then was rehired on April 18, 2005 as a trader in the Chicago office. Todd signed an employment agreement on April 18, 2005. Attached hereto as Exhibit I is a true and correct copy of Todd's employment agreement. On October 1, 2006, Todd was awarded a number of Restricted Units to Group One LLC and effectively became a member of the LLC on that same day. Attached hereto as Exhibit J is a true and correct copy of Todd's signed Restricted Unit Agreement, binding him to the terms of the LLC's Operating Agreement. Also attached hereto as Exhibit K is a true and correct copy of Todd's signed Member Consent to Amendment No. 4 of the Operating Agreement.

16.     Todd had access to Group One's copyrighted, trade secret and confidential information on a need to know basis only. I am informed and believe that Todd voluntarily

terminated his employment with Group One on Sunday, November 18, 2007 by calling Mr. Londergan on the phone that day and verbally tendering his resignation. Todd did not give prior notice of his resignation

17.    John Petrizzo originally began employment with Group One on April 19, 1999. Petrizzo terminated his employment on April 25, 2003, but was rehired by Group One on October 13, 2004 as a trader in the New York office. On October 1, 2006, Petrizzo converted a number of Units of interests in Group One Trading LP into Units of Group One's LLC, and effectively became a member of the LLC on that same day. Attached hereto as Exhibit L is a true and correct copy of Petrizzo's signed LLC membership agreement in 2006, binding him to the terms of the LLC's Operating Agreement.

18.    Petrizzo had access to Group One's copyrighted, trade secret and confidential information on a need to know basis only. Petrizzo voluntarily terminated his employment with Group One on November 16, 2007. Petrizzo did not give prior notice of his resignation

19.    As traders for Group One, all of the defendants had access to the tools and software scripts that Group One provided to its traders to effectively perform their duties— namely, copyrighted software scripts, formulas, tools and "best practices" information.

## Defendants' Misappropriation of Group One's Copyrighted, Trade Secret, Proprietary and Confidential Information

20.    I am informed and believe that in the days and months prior to his resignation, Spieldenner accessed, downloaded and/or emailed to himself copyrighted, trade secret, confidential and proprietary information belonging to Group One. I am informed and believe that all of the defendants were complicit in the theft of Group One information. I am informed and believe that the defendants intend to form their own company or partnership to compete with Group One and intend to use Group One's copyrighted, trade secret, proprietary and confidential information in their new business to compete against Group One.

21.     Given the vast amount of information taken, below I describe the information in general categories for purposes of efficiency.  However, each item of information is very valuable to Group One, and my general description should not be construed as minimizing the importance of any item.

22.     For purposes of facilitating comprehension of the information taken, I have categorized the information in the following categories: (1) Copyrighted Trading Scripts; (2) Software Formulas and Code; (3) Proprietary Best Practices Information; (4) Copyrighted and Confidential Operations documents; (5) Vendor and Contact Information; (6) Industry and Regulatory Research.

## Copyrighted Trading Scripts

23.     I am informed and believe that the defendants took, without authorization, several of Group One's copyrighted trading scripts or software code including, but not limited to, the following:  (a) PET; (b) HAL (c) CMC-db; (d) CMQ-bq; (e) CEH_bp, (f) CMS_db, (g) CMQ_hu, and (h) CMQ_izp.

24.     Group One utilizes a trading software application called Aqtor® developed by a third party vendor Actant.  Aqtor® is a front-end software that offers real-time derivatives risk management and automated trading.  It is the main tool used by Group One traders to make their trades.  Aqtor® is highly configurable and customizable so that Group One can tailor it to reflect Group One's strategies, styles and needs.  Actant maintains a website at www.actant.com that provides a high-level description of Aqtor®.

25.     Aqtor® also allows Group One to develop its own scripts, or software code, that interacts with Aqtor® so that Group One can leverage its trading strategies.  These coded scripts are algorithms that assist Group One's traders in entering and exiting the market place.  Group One's proprietary trading strategies are embodied in these scripts.  These scripts provide traders with an automated response that acts infinitely faster than any manual intervention would allow.

26.     Group One has invested substantial time and effort into developing these scripts

for optimal use by their traders.  Group One employs data analysts, a quantitative analyst – who has a PhD in that subject – and software programmers who developed Group One's scripts. Group One's development of these scripts followed the software development lifecycle: Group One developed requirements documents, coded the scripts using a software language, alpha and beta tested the scripts, and debugged them.  It took Group One at least 24 months and $400,000 to develop these scripts.  Group One continues to develop the scripts over time.  The scripts are priceless to Group One's business and are part of the heart and soul of Group One's success.

27.     The trading scripts are formulas, compilations, programs, processes, information and techniques not generally known to the public and derive independent economic value as such.  If a competitor had access to Group One's scripts, the competitor could learn all of Group One's trading strategies and compete unfairly with Group One.  Moreover, they embody invaluable collective knowledge and effort by Group One personnel, incorporating feedback from over fifty traders over the past three years.  Because of their uniquely recursive development, these scripts are regarded by traders to be highly reliable tools; a trader can be confident that these scripts are providing him with accurate information which in turn allows him to quote more aggressively while making trades.  Thus, these scripts provide value beyond their usefulness as mere algorithmic tools: the scripts provide Group One traders with a stable foundation on which they can rely completely.  Accordingly, these scripts allow traders to quote more aggressively because they can be confident that they work.

28.     In order to protect their confidential and proprietary interest in these scripts, Group One has copyrighted and registered the scripts with the United States Copyright Office. Attached hereto as Exhibit M is a true and correct copy of the copyright registrations for the Group One scripts taken by the defendants.

29.     To remind its traders, of the highly sensitive nature of these tools, Group One sends out monthly emails reminding personnel to safeguard the confidentiality of these scripts and not to share them with anyone outside of Group One.  Attached as Exhibit N is a true and correct copy of an example of a monthly email sent out to Group One personnel regarding

keeping the scripts confidential.  Group One also takes several additional steps to protect these scripts, as described below.

## Confidential Tools and Formulas

30.     Group One also develops a number of tools that assist traders in trading.  I am informed and believe that the defendants took a number of these tools and formulas including, but not limited to, the following: (1) spreadsheet containing a compilation of split rounding errors; (2) volume utility list; (3) ACXM dutch formulas; (4) explanations of concepts underlying the code for "Kitchen Sink;" (5) compilation of changes in trading scripts in 2007; (6) cash spread calculator; and (7) Risk Point Calculation Point formula.  Group One invests substantial time and money into refining these tools.  All of these materials include information, formulas, processes, compilations, methods and techniques that are not generally known to the public and derive independent economic value as such.  Disclosure of such information to competitors would provide them with a competitive advantage in the option trade industry and cause substantial harm to Group One.

31.     As an example, I am informed and believe that the defendants took Group One's internally developed Risk Point Calculation Formula.  The Risk Point System functions as a measurement of risk of each trader's trading position.  The Risk Point System calculates exposure based on several measures of risk, including volatility and carry.  The Risk Point Calculation Formula utilized by the Risk Point System is unique to Group One and reflects the collective knowledge and experience of its traders.  Moreover, Group One's risk management personnel have developed and refined the Risk Point Calculation Formula for many years, optimizing it for use by Group One traders.

32.     As a security measure, only traders at Group One have access to the Risk Point Calculation Formula.  Traders each have access to the Risk Point Calculation Formula through Grid Web, which provides them with an automated assessment of risk in relation to his own

position or portfolio. A trader's access to the Risk Point Calculation Formula is crucial in order for him to manage his own risks; as such, access is restricted on a "need to know" basis.

33.    In the option trading business, which depends on managing risk and estimating potential exposure, a tool such as the Risk Point System in conjunction with the Risk Point Calculation Formula is highly valuable. Proper risk management is crucial to a trading firm for its own functioning but also important to investors. As such, traders seeking to establish a new company would greatly benefit from access to the definition and calculation of how Group One assigns and allocates "risk points" to an individual trader or issue.

34.    The Risk Point Calculation Formula is a compilation of information not generally known to the public and derives independent economic value as such. Moreover, it embodies invaluable collective knowledge and effort by Group One personnel, incorporating feedback from numerous traders making millions of trades over the years. Again, due to their uniquely recursive development, the Risk Point System combined with the Risk Point Calculation Formula is regarded by Group One's traders to be a highly reliable tool. Thus, Risk Point Calculation Formula provide value beyond its usefulness as mere automated calculator of exposure: the Risk Point System combined with the Risk Point Calculation Formula provides Group One traders with peace of mind in regards to accurate risk assessment.

## **Proprietary Best Practices Information**

35.    Group One also develops a number of "best practices" procedures for trading and optimizing Group One's traders' performance. Group One spends significant time and money developing these best practices, including testing these best practices in live situations and through trial and error. I am informed and believe that the defendants took, without authorization, documents and emails containing Group One's "best practices" including, but not limited to, the following: (1) Spin off and cash indexes; (2) interest rate compilations; (3) "quick guide" to interest rates; (4) QOT settings cheat sheet (including a grid in Actant that contains

particular settings); (5) Group One library; (6) COB and COA procedures; (7) Aqtor rollout (testing of Actant software);  (8) Guide to Indexing; (9) compilation on Takeovers; (10) analysis of January 2008 options (including risk management group's opinions); (11) Actor 3:60; (12) Tips on Avoiding COB Over-quoting; (13) Dutch auctions; (14) GI Tools document; and (15) the Penny Quoted Options Checklist.

36.    All of these materials are compilations and include information that is not generally known to the public and derive independent economic value as such.  Disclosure of such information to competitors would provide them with a competitive advantage in the option trade industry—especially in establishing a new trading firm— and cause substantial harm to Group One.

37.    For example, Group One developed a Penny Quoted Options Checklist ("Penny Checklist").  The Penny Checklist establishes guidelines for the proper settings in trading software to avoid mistakes and optimize usage.  Again, the Penny Checklist is a product of the collective knowledge and experience of personnel at Group One, and therefore reflects their trial and error with various software.  Because quoting in pennies is relatively new to the industry, having a guideline for settings work stations and for Actant software is crucial for traders to perform their jobs properly.  As such, Penny Checklist is a proprietary document, internally developed by Group One over a period of several months, that sets forth a procedure for avoiding pitfalls caused by technical mishaps.

38.    Group One also recognizes the importance and effectiveness of capitalizing on the experience of their own traders: Group One constantly solicits feedback from traders about the tools they use in order to refine and improve them; "how-to" guidelines and "best practices" documents are produced, updated and circulated routinely; and senior traders "teach" the Training Program for new traders, integrating their own experience into core Group One Training Program curriculum.

## Copyrighted Recruiting Manual

39.     I am informed and believe that the defendants took, without permission, Group One's confidential and copyrighted recruiting manual.

40.     The market for the most qualified options traders is highly competitive. Group One's success is directly related to hiring the best and brightest traders. The Recruiting Manual was internally developed by Group One and reflects a determination of the traits and values that Group One deems important in a potential trader candidate. This is not a routine recruiting manual with standard information that other companies may use. Rather, Group One's Recruiting Manual contains a list of non-standard questions that Group One interviewers are supposed to ask interviewees. These are not routine questions, such as "Describe a difficult obstacle you had to overcome in your life?" Rather, these questions are non-standard and unique to Group One. They were developed based on years of analysis and testing and are designed to weed out candidates that do not meet Group One's values. These questions were developed based on years of analysis and testing. Moreover, the Recruiting Manual also contains information about Group One's recruiting goals, recruiting strategy, and rates of success at various colleges throughout the mid-west; the information derives from Group One's years of interview experience and error use of various recruitment tactics. Such information thus constitutes a compilation of knowledge not generally known to the public and derives independent economic value because it allows another trading firm to identify the candidates who are most likely to be successful traders.

41.     Group One has taken reasonable steps to protect the confidential and proprietary information embodied in the Recruiting Manual by copyrighting it. The Recruiting Manual is made available to traders on a "need to know" basis, usually only accessible to those traders who are conducting interviews.

## Vendor Information

42.     I am informed and believe that the defendants took, without permission, Group

One's Upstairs Broker List.

43.    Group One's Upstairs Broker List ("Broker List") constitutes a compilation, developed over a period of years, of names, contact information, and rates of brokers. The Broker List not only aggregates information for particular brokers who Group One has worked with in the past, but also reflects Group One's experience and judgment about which brokers are *best* to work with in the industry. The list is updated regularly. Furthermore, the rates listed in Group One's Upstairs Broker List reflect negotiated rates applying specifically to Group One. None of this information is publicly available.

44.    If disclosed to a competitor, the Broker List would allow any newly formed trading company to easily gain inside information about Group One's trusted brokers and the confidential rates charged by them. In essence, the information permits another trader to easily step in and capitalize on years of experience that Group One has amassed through trial and error in working with various brokers. As such, this information derives independent economic value from not being generally known both to the public and to other persons who can obtain economic value from its disclosure and/or use. Disclosure of this broker list would save a competitor the time, money, and effort to find its own reliable brokers. This is profoundly unfair.

45.    Group One has taken reasonable steps to protect the confidential and proprietary information embodied in the Broker List by making it available on a "need to know" basis to traders, who must factor in the rates to the level of commission to calculate their pricing when making trades. Accordingly, the Broker List was sent to traders by Harris Bock in Sales for this limited purpose.

## Industry and Regulatory Research

46.    I am informed and believe that the defendants took, without permission, Group One's industry and regulation research including, but not limited to, Biotech Alpha compilations and Group One's interpretation of the Reg SHO Regulations

47.    Group One has also developed research on specific topics relating to the option

trading industry for internal company use by its traders. For example, the document entitled Biotech Alpha contains a compilation of Biotech announcement dates, which are extremely important for options pricing in any company that has a Federal Drug Administration announcement. The Biotech Alpha compilation reflects numerous hours of research conducted by Group One's employees. As such, the document derives independent economic value from not being generally known both to the public and to other persons who can obtain economic value from its disclosure and/or use.

48.    Group One has taken reasonable steps to protect the confidential and proprietary information embodied in its research by making it available on a "need to know" basis to traders.

## Security Measures Taken by Group One to Safeguard Its Information

49.    Group One has taken reasonable steps to ensure the physical safety of its confidential and proprietary trade secret and/or copyrighted information. All of the offices are housed within secure facilities, with files kept in locked cabinets and computers requiring password entry. After-hour access to a branch office is limited only to authorized personnel with key-cards.

50.    Group One has also taken reasonable steps to ensure that all employees understand and comply with company policies to keep confidential and proprietary information, including trade secrets and/or copyrighted information, a secret. Group One has taken the step of copyrighting many of its confidential and proprietary materials, such as the scripts developed for its use by Actant.

51.    Employees are asked to review the Group One Employee Handbook (the "Handbook") on a yearly basis and must sign an acknowledgement and receipt. The Handbook contains various provisions designed to protect the security of Group One's confidential and proprietary information. For example, Section 1. b. "Confidential Information" states:

> Employees will not communicate to any third party (other than in his/her assigned duties and for the benefit of the Company) any of

Group One Trading, L.P.'s confidential information, either while employed or after employment with the Company.

Confidential information includes all non-public information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information whose unauthorized disclosure could be detrimental to the Company. No Group One employee shall directly or indirectly use any confidential information for personal gain.

No Group One employee shall directly or indirectly use any non-public information in the execution of securities transactions. On this point, Group One employees will be required to understand and follow securities laws and exchange rules relating to "insider information" and "conflicts of interest." No one is permitted to remove or make copies of any Company records, reports, or documents without prior management approval.

Other relevant security provisions specific to Group One's intellectual property include Section

3.e. "Intellectual Property":

Inventions, Designs, Software and Program Development

Group One Trading, L.P. encourages the creation and development of new software, programs, designs, and the like, for the betterment of the firm. It is the responsibility of each individual, both regular staff and independent contractors (referred to as "Individual"), to disclose all inventions and software development made while in the employ or services of Group One Trading, L.P.

1a.    As an employee, you agree to promptly disclose to Group One Trading, L.P. in writing the existence and nature of any invention that you may have created. Group One Trading, L.P. will maintain all such disclosures in confidence. Group One Trading, L.P. and you understand that all inventions made by you prior to your employment with Group One Trading, L.P. or its affiliates are excluded from the scope of this policy/agreement. As a matter of record, you must list such prior inventions with Human Resources. You represent and covenant that such list is complete.

1b.    As an employee, you further agree that, except for inventions covered by paragraph (1a) of this policy, all inventions created while you are employed by Group One Trading, L.P. and utilizing Group One resources are the sole property of Group One Trading, L.P. You hereby assign to Group One Trading, L.P. all right, title and interest which you may now have or later acquire in inventions which are not subject to paragraph (1a). If requested by Group One Trading, L.P. You acknowledge this assignment and deliver any instruments confirming Group One Trading, L.P. ownership of all such inventions. Additionally, you will execute whatever documents may be necessary for obtaining patents, copyrights or trademarks in the inventions owned by Group One Trading, L.P. You will cooperate with Group One Trading, L.P. in

the prosecution or defense of any patent claims or copyright claims or any litigation or other proceeding involving an invention covered by this paragraph (1b), at Group One Trading, L.P.'s expense.

2.    Company's Remedies: You acknowledge that your failure to comply with this agreement may be brought before a court of law. In these instances, the Company may seek damages, including, but not limited to, all costs associated with such litigation.

Attached hereto as Exhibit O is a true and correct copy of relevant portions of the 2007

Employee Handbook. Attached hereto as Exhibit P through T are true and correct copies of the

individual defendants' signed acknowledgements of review and receipt of the Handbook.

52.    The Handbook also includes a Software Code of Ethics, which also requires a

signed acknowledgement form from employees. The Software Code of Ethics, Section 3.b.,

provides:

Unauthorized duplication of copyrighted computer software violates the law and is contrary to our organization's standards of conduct. We disapprove of such copying and recognize the following principles as a basis for preventing its occurrences:

We will neither engage in nor tolerate the making or using of unauthorized software copies under any circumstances.

We will provide legally acquired software to meet the legitimate software needs in a timely fashion and in sufficient quantities for all our computers.

We will comply will all license or purchase terms regulating the use of any software we acquire or use.

We will enforce strong internal controls to prevent the making or using of unauthorized software copies, including effective measures to verify compliance with these standards and appropriate disciplinary measures for violation of these standards.

Attached hereto as Exhibit O is a true and correct copy of relevant portions of the 2007

Employee Handbook. Attached hereto as Exhibit U through X are true and correct copies of the

individual defendants' signed acknowledgements of review and receipt of the Software Code of

Ethics.

53.    Employees are also asked to review the Written Supervisory Procedures ("WSP")

and must sign an acknowledgement and receipt on a yearly basis. The WSP sets forth certain security rules. Each of the defendants signed acknowledgments of this WSP, which are on file with the Human Resources department. Attached hereto as Exhibit Y through CC are true and correct copies of the individual defendants' signed acknowledgements of review and receipt of the WSP.

54.     In addition, each of the individual defendants executed an Employment Agreement ("Employment Agreement") with Group One. Each Employment Agreement contained a "Confidentiality" clause that prohibits employees from improperly using or disclosing Group One information. For example, Stanton Todd's 2005 Employment Agreement provided the following at paragraph 6:

> 6. Confidential Information.
>
> (a) Existence of Confidential Information. Employee acknowledges and agrees that the Company owns and has developed and compiled, and will develop and compile, certain proprietary techniques and confidential information which have great value to its business (referred to in this Agreement collectively as "Confidential Information"). Confidential Information includes not only information disclosed by the Company to Employees, but also information developed or learned by Employee during the course of employment with the Company. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company. By example and without limitation, Confidential Information includes any and all information concerning trade secrets, techniques (including trading techniques, analyses of options and equity markets), software, processes, formulas, computer programs, innovations, discoveries, improvements, research, development, test results, reports, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, projections, customer and supplier identities, characteristics and agreements.
>
> (b) Protection of Confidential Information. Employee will not, directly or indirectly, use, make available, sell, disclose, or otherwise communicate

to any third party, other than in the course and scope of his or her assigned duties and only for the benefit of the Company, any of the Company's Confidential Information, either during or after employment with the Company.

(c)  Delivery of Confidential Information.  Upon request by Company management, or when employment with the Company terminates, Employee will immediately deliver to the Company all originals and any copies (whether in paper, electronic, or other form) of any and all materials and writings received from, created for or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

(d)  Survival.  The obligations under this Section shall survive termination of this Agreement for any reason.

Attached hereto as Exhibits B, D, F, and I are true and correct copies of the defendants'

employment agreements.

55.    Furthermore, each of the individual defendants executed a Operating Agreement

("Operating Agreement") with Group One that provided the following at paragraph 14.21:

14.21 Confidentiality:

Each Member shall, at all times during the term of this Agreement and thereafter, use its best efforts and take all appropriate steps to safeguard the secrecy and confidentiality of the Partnership's marketing plans, customer information, data bases, financial information and other confidential information regarding the Partnership and its activities (the "Information").  Each Member agrees as follows:

A.      Only those employees of the Member who need to know the Information in order to carry out the purposes of the Partnership shall have access to the Information, and such access shall be limited only to so much of the Information as is necessary for the particular employee to perform his or her function.

B.      No Member shall disclose, or allow any of its employees or Affiliates to disclose, any of the Information to any third party (whether or not an Affiliate of a Member) without the approval of the Board, it being understood that such approval shall not be given unless and until the third party shall have agreed to execute an agreement of confidentiality in form reasonably satisfactory to the Board, obligating

the third party not to reveal the Information except on the terms provided therein.

C.    A Member shall not and, shall not allow its Affiliates to, make use of any of the Information, including Disclosed Date (as hereinafter defined), except in furtherance of the business of the Partnership. This Section shall not apply to any Information which: (i) is or becomes generally available to the public under circumstances which do not involve a breach of the terms of this Section; or (ii) is generally disclosed to third parties by the Partnership without restrictions on such third parties ("Disclosed Data").

Attached hereto as Exhibit A is a true and correct copy of the Operating Agreement for Group One Trading LLC.

56.    Group One has also taken reasonable steps to ensure the electronic safety of its confidential and proprietary trade secret and/or copyrighted information. Much of Group One's information resides on Grid Web, a proprietary, intranet system requiring password entry. Grid Web hosts a variety of Group One's confidential and proprietary information, access to which is automatically restricted by Grid Web based on the user's status as an employee. For example, only traders have access to Risk Points. All of this information is treated as confidential and access to it is restricted to a "need to know" basis within Group One's employees.

I, John Gilmartin, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing declaration and the information contained herein is true and correct to the best of my knowledge and belief. Executed this 5th day of December, 2007.

_____
                                    John Gilmartin

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

Group One Trading LP,

        Plaintiff,

    v.

Lauren DeLuca, Lawrence Spieldenner,
John Superson and Stanton Todd,

        Defendants.

No. 07 CV 6881

Honorable Virginia M. Kendall

Magistrate Judge Susan E. Cox

# EXHIBIT A

**Amended and Restated Operating Agreement for Group One Trading LLC, A California Limited Liability Company has been withheld pending the Court's ruling on Group One's Motion for Protective Order.**

# Exhibit B



**GROUP ONE**
T R A D I N G   L P

Group One Trading, LP
440 S. LaSalle St., Suite 3232
Chicago, IL. 60605

Larry Spieldenner
2300 Lincoln Park West, Apt. 625
Chicago, IL. 60614

      Re:    Employment Relationship

Dear Larry:

      This letter shall set forth the terms and conditions between you ("Employee") and Group One Trading, L.P. and its affiliates (the "Company") in connection with your employment by the Company.

    1.    Employment.

      (a)    Term. The Company hereby employs Employee to serve in such position or positions as the Company may determine in its sole discretion. Either party may terminate Employee's employment with the Company at any time and this agreement is intended to create an "at will" employment relationship between the parties.

      (b)    Direction. The Company shall retain full direction and control of the manner, means and methods by which Employee performs the services for which he or she is employed hereunder and of the place or places at which such services shall be rendered.

    2.    Compensation. Employee shall be paid a base salary at the initial annual rate of $37,500, payable in installments consistent with Company's payroll practices. Payment of all compensation to Employee hereunder shall be made in accordance with the relevant Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

    3.    Other Employment Benefits.

      (a)    Benefit Plans. Employee shall be entitled to participate in the Company's existing health and medical programs pursuant to their terms and conditions. Nothing in this Agreement shall preclude the Company from terminating or amending any employee benefit plan or program from time to time.

      (b)    Vacation. Upon promotion to trader, employee shall be entitled to three (3) weeks of vacation for each year of full employment, exclusive of legal holidays, provided the scheduling of Employee's vacation does not interfere with the Company's normal business operations.

      (c)    No Other Benefits. Employee understands and acknowledges that the compensation specified in Sections 2 and 3 of this Agreement shall be in lieu of any and all other compensation, benefits and plans, and that, in the event an employee benefit plan of any nature is developed or

maintained by the Company in the future, Employee shall have no right to participate therein by virtue of this Agreement; such right, if any, shall be granted by the Company in its sole discretion.

    4.    <u>Employee's Business Activities</u>. Employee shall devote his or her professional time, attention and energy substantially to the business and affairs of the Company and its affiliates, as its business and affairs now exist and as they hereafter may be changed, and shall not during the term of his or her employment hereunder be engaged in any other business activity which interferes with the Employee's obligation to the Company.

    5.    <u>Training Expenses</u>.

    (a)    <u>Expenses</u>. Company is expected to incur expenses of $100,000 for certain training of Employee (the "Training Cost").

    (b)    <u>Reimbursement to Company While Employed</u>. Beginning on the date that Employee is promoted to full market maker, if ever, the Training Cost will be amortized on a straight line basis over a 24 month period (approximately $4,165 per month). If Employee terminates his employment with the Company for any reason, Employee shall immediately reimburse to the Company the unamortized portion of the Training Cost by certified check (or, at the option of the Company, through deduction of any final salary payment owed).

    (c)    <u>No Reimbursement Required if Employee Terminated by Company for Other than Cause</u>. In the event that Company elects to terminate Employee's employment for other than "cause" (it being understood that the Company has the complete right and discretion to terminate Employee for any reason), Employee shall not be obligated to reimburse the Company for the unreimbursed portion of the Training Cost. "Cause" is herein defined to mean: loss of legal capacity; dishonesty; incompetence; breach by Employee of this Agreement; misconduct; actions by Employee detrimental to Company's reputation; or Employee's conviction of a criminal offense.

    6.    <u>Confidential Information</u>.

    (a)    <u>Existence of Confidential Information</u>. The Company owns and has developed and compiled, and will develop and compile, certain proprietary techniques and confidential information which have great value to its business (referred to in this Agreement collectively as "Confidential Information"). Confidential Information includes not only information disclosed by the Company to Employee, but also information developed or learned by Employee during the course of employment with the Company. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company. By example and without limitation, Confidential Information includes any and all information concerning trade secrets, techniques, software, processes, formulas, computer programs, innovations, discoveries, improvements, research, development, test results, reports, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, projections, customer and supplier identities, characteristics, and agreements.

    (b)    <u>Protection of Confidential Information</u>. Employee will not, directly or indirectly, use, make available, sell, disclose, or otherwise communicate to any third party, other than in his or her assigned duties and for the benefit of the Company, any of the Company's Confidential Information, either during or after employment with the Company.

(c)      Delivery of Confidential Information. Upon request or when employment with the Company terminates, Employee will immediately deliver to the Company all copies of any and all materials and writings received from, created for or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

(d)      Survival. The obligations under this Section shall survive termination of this Agreement for any reason.

7.      Exclusive Employment. During employment with the Company, Employee will not do anything to compete with the Company's present or contemplated business, nor will he or she plan or organize any competitive business activity. Employee will not enter into any agreement which conflicts with his or her duties or obligations to the Company. Employee will not during his or her employment or within one (1) year after it ends, directly or indirectly, hire, solicit or encourage to terminate or alter a relationship with the Company, any employee, agent, independent contractor, client, supplier, customer, or consultant of the Company.

8.      No Inconsistent Obligations. Employee is aware of no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with his or her undertaking employment with the Company. Employee will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that he or she has returned all property and confidential information belonging to all prior employers.

9.      Miscellaneous.

(a)      Attorneys' Fees. Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to litigation or arbitration in connection with this Agreement or Employee's employment with the Company, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its or their reasonable attorneys' fees and costs in such litigation or arbitration from the non-prevailing party or parties.

(b)      Entire Agreement. This Agreement, together with the attached exhibits, contains the entire agreement and understanding between the parties hereto and supersedes any prior or contemporaneous written or oral agreements between them respecting the subject matter hereof.

(c)      Amendment. This Agreement may be amended only by a writing signed by Employee and by a duly authorized representative of the Company.

(d)      Severability. If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

(e)      Construction. The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement. The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Employee.

(f)      Remedy for Breach. The parties hereto agree that, in the event of breach or threatened breach of any covenants of Employee, the damage or imminent damage to the value and the goodwill of the Company's business shall be inestimable, and that therefore any remedy at law or in damages shall be inadequate. Accordingly, the parties hereto agree that the Company shall be entitled to injunctive

relief against Employee in the event of any breach or threatened breach of any of such provisions by Employee, in addition to any other relief (including damages) available to the Company under this Agreement or under law.

       (g)   <u>Assistance in Litigation</u>.  Employee shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become a party.

       (h)   <u>Arbitration</u>.  Any controversy, claim or dispute arising out of or relating to this Agreement or the employment relationship between Employee and Company, either during the existence of the employment relationship or afterwards, between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be settled by arbitration in San Francisco, California.  Arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association.  The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided however, that nothing in this subsection hereof shall be construed as precluding the Company from bringing an action for injunctive relief or other equitable relief.  The parties shall keep confidential the existence of the claim, controversy or disputes from third parties (other than arbitrator(s)), and the determination thereof, unless otherwise required by law.

            If this is acceptable to you, please sign and return a copy to us of this letter.

Dated: ___4/11/01___

                    Group One Trading, L.P.

                    By: _Julie Schreiner_____

                    Name: Julie Schreiner
                    Title: Human Resources Manager

Accepted and Agreed:

_Larry Spieldenner_____
Signature of Employee

_Lawrence Spieldenner_____
Printed Name

SF3-40339.2

# Exhibit C

## GROUP ONE TRADING LLC 2005 EMPLOYEE RESTRICTED UNIT PLAN

### RESTRICTED UNIT AGREEMENT

GROUP ONE TRADING LLC, a California corporation (the "Company"), hereby awards the number of Restricted Units indicated below to the Participant named below. The terms and conditions of the Award are set forth in this cover sheet, in the attached Restricted Unit Agreement, in the 2005 Employee Restricted Unit Plan (the "Plan") and the Amended and Restated Operating Agreement of the Company, dated as of October 1, 1999, as amended from time to time (the "Operating Agreement").

1. Date of Award:                                                             October 1, 2005

2. Name of Participant:                                          SPEILDENNER, LARRY

3. Participant's Social Security Number:                      **REDACTED**

4. Number of Restricted Units Awarded:                      5,358

5. Amount Paid by Participant for the Restricted Units Awarded:      111,344

6. Beginning Capital Account:                                    111,344

Note to form: If cash consideration is paid, this should be at least the amount of the cash consideration. For Awards granted with no cash consideration, the amount can be zero or any other amount determined by the Committee. The employee will recognize gain on the difference between the cash consideration paid (or zero for no cash consideration grants) and the beginning Capital Account.

7. First Date When Restricted Units May be (a) Transferred or (b) Required to be Purchased by the Company under Section 8.1A(iv) of the Operating Agreement     September 30, 2008

Note to form: This will be either the third or fifth anniversary of the date of the Award, as determined by the Committee.

California residents only:

8. The undersigned represents and warrants that he or she (a) has a pre-existing personal or business relationship with the Company or any of its officers, directors, controlling persons or managers and (b) is purchasing Restricted Units only for his or her own account, and not with a view to or for sale in connection with any distribution of the Restricted Units.

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Restricted Unit Agreement and in the Plan and the Operating Agreement. You are also acknowledging receipt of this Agreement, a copy of the Plan and a copy of the Operating Agreement.*

Participant: _____
                                (Signature)

Company: _____
                                  (Signature)

Title: _____
Attachment

GROUP ONE TRADING LLC EMPLOYEE RESTRICTED UNIT PLAN

RESTRICTED UNIT AGREEMENT

**GROUP ONE TRADING LLC**, a California corporation (the "Company"), hereby awards the number of Restricted Units indicated below to the Participant named below. The terms and conditions of the Award are set forth in this cover sheet, in the attached Restricted Unit Agreement, in the 2005 Employee Restricted Unit Plan (the "Plan") and the Amended and Restated Operating Agreement of the Company, dated as of October 1, 1999, as amended from time to time (the "Operating Agreement").

1. Date of Award:                                                          October 1, 2006

2. Name of Participant:                                          *Larry Spielderner*

3. Participant's Social Security Number:                    **REDACTED**

4. Number of Restricted Units Awarded:                               *1,860*

5. Amount Paid by Participant for the Restricted Units Awarded:      # 4 X $44 = *# 81,840*

6. Beginning Capital Account:                                       # 4 X $44 = *# 81,840*

Note to form: If cash consideration is paid, this should be at least the amount of the cash consideration. For Awards granted with no cash consideration, the amount can be zero or any other amount determined by the Committee. The employee will recognize gain on the difference between the cash consideration paid (or zero for no cash consideration grants) and the beginning Capital Account.

7. First Date When Restricted Units May be (a) Transferred or (b) Required to be Purchased by the Company under Section 8.1A(iv) of the Operating Agreement          September 30, 2009

Note to form: This will be either the third or fifth anniversary of the date of the Award, as determined by the Committee.

California residents only:
8. The undersigned represents and warrants that he or she (a) has a pre-existing personal or business relationship with the Company or any of its officers, directors, controlling persons or managers and (b) is purchasing Restricted Units only for his or her own account, and not with a view to or for sale in connection with any distribution of the Restricted Units.

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Restricted Unit Agreement and in the Plan and the Operating Agreement. You are also acknowledging receipt of this Agreement, a copy of the Plan and a copy of the Operating Agreement.*

Participant: _____
                                                    (Signature)
Company: _____
                                                    (Signature)
Title: _____ CFO
Attachment

DOCSSF1:769905.6
8046-1 DYM

# Exhibit D



Group One Trading, LP
440 S. LaSalle St, Suite 3232
Chicago, IL. 60605

Lauren DeLuca
3051 Maple Road
Newfane, NY 14108

Re:    Employment Agreement

Dear Lauren:

This letter shall set forth the terms and conditions between you ("you", "your" or "Employee") and Group One Trading, LP. and its affiliates (the "Company") in connection with your employment by the Company.

1.  Scope of Employment.

(a)    Direction.  The Company hereby employs Employee to serve in such position or positions as the Company may determine in its sole discretion.  The Company shall retain full direction and control of the manner, location, means and methods by which you perform the services for which you are employed hereunder.

(b)    Term.  Unless earlier terminated by either party as specified below in paragraph 5, it is the intent of the parties that this Agreement shall run for a three-year period of time, covering an initial year in the Trader Trainee Program and Employee's first two years as a Trader.

2.  Compensation.

(a)    Trainee Compensation.  Employee shall be paid, as a Trader Trainee, an initial annual salary of $50,000, payable in bi-weekly installments consistent with Company's payroll practices.  The initial rate of pay shall continue during Employee's Phase I and Phase II training periods.  Upon completion of Phase II and entry into Phase III training, Employee shall be paid for the remainder of the Training Program at the annual salary rate of $75,000 per annum.  Payment of all compensation to Employee hereunder shall be made in accordance with the relevant Company policies in effect at the time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

(b)    Trader Compensation.  Upon completion of Phase III of the Trader Trainee Program (which is expected to occur not later than one year from Employee's entry into the Program), Employee shall become a Trader (Full Time Market Maker) and shall be paid an annual recoverable draw of $75,000, and a one time cash payment of $833.00 (less taxes) for

each month Employee has spent in the training program. Employee shall also be eligible for a 25% bonus on trading profits as provided in the Company's Trading Compensation and Bonus Plan. The actual terms of the Trader Compensation and Bonus Plan are set forth in Appendix A.

    3.   Other Employment Benefits.

    (a)    Benefit Plans. Employee shall be entitled to participate in the Company's existing health and medical programs pursuant to their terms and conditions. Nothing in this Agreement shall preclude the Company from amending, adding or terminating any employee benefit plan or program.

    (b)    Vacation. As a trainee, Employee shall be entitled to two (two) weeks of vacation for each year of full employment, exclusive of legal holidays, provided the scheduling of Employee's vacation does not interfere with the Company's normal business operations. Upon promotion to full trader, Employee will be entitled to vacation pursuant to the terms set forth in the personnel policy manual.

    (c)    Employee understands and acknowledges that the compensation and benefits specified in Sections 2 and 3, respectively, of this Agreement shall be in lieu of any and all other compensation, benefits and plans, and that, in the event an employee benefit plan of any nature is developed or maintained by the Company in the future, Employee shall have no right to participate therein by virtue of this Agreement; such right, if any, shall be granted by the Company in its sole discretion.

    4.   Employee's Business Activities. Employee shall devote his or her professional time, attention and energy substantially to the business and affairs of the Company, as its business and affairs now exist and as they hereafter may be changed, and shall not during the term of his or her employment hereunder be engaged in any other business activity which interferes with or otherwise conflicts with the Employee's obligation to the Company.

    5.   Employment Status and Termination of Employment.

    (a)    At-will Employment. Employee's employment under this Agreement is and will remain, at all times, "at-will." This means that Employee or the Company may terminate this Agreement, and the employment relationship, at any time, for any reason, with or without cause and with or without notice.

    (b)    Change in "At-will" Status. Any change to Employee's at-will status can only occur if it is contained in a writing signed by Employee and the Company's Director of Human Resources.

    (c)    In the event that Employee voluntarily terminates employment for any reason, Employee shall only be entitled under this Agreement to base salary earned, and to accrued but unused vacation, through the date employment terminates. Employee's obligation, if any, regarding reimbursement of training costs is set forth in paragraph 6(b).

    (d)    In the event that Employee is terminated by the Company, other than for Cause, as defined in paragraph 5(f) below, Employee shall be paid base salary through

the date of termination, as well as accrued vacation. Payment of a bonus, if any, shall be made pursuant to the Trader Compensation and Bonus Plan referenced in Appendix A.

(e)     If Employee is terminated for Cause, as defined in paragraph 5(f) below, Employee shall only be entitled to payment of any salary and accrued vacation owed to Employee as of the date of termination. Employee's obligations regarding training costs reimbursement are set forth in paragraph 6(b) and Appendix __. Payment of a bonus, if any, shall be made pursuant to the Trader Compensation and Bonus Plan referenced in Appendix A.

(i)     "Cause" is herein defined to mean:  loss of legal capacity to trade, or a determination by the Company of any of the following:  misconduct, dishonesty, gross negligence or unsatisfactory performance by the Employee, breach by Employee of paragraphs 4, 7, 8 or 9 of this Agreement; actions by Employee detrimental to Company's business interests or its reputation; failure or refusal to follow reasonable directions from management; or Employee's conviction of a criminal offense.

(f)     Except as provided herein, Employee shall not be entitled to any other compensation.

6.   Training Costs.

(a)     Training Costs. The Company is expected to incur expenses in excess of $250,000 in connection with the training of Employee (the "Training Cost"). Employee understands that the training services and assistance provided by the Company involve a substantial, actual cost to the Company and that the training will provide substantial benefits to the Employee, including significant expertise and marketable skills.

(b)     Reimbursement of Training Costs if Employee Voluntarily Leaves or Is Terminated for Cause After Training Program. Beginning on the date that Employee is promoted to Trader (full-time market maker), if ever, the obligation to reimburse the Training Cost will be reduced on a straight line basis monthly, over a 24-month period ($10,420 per month on the last day of the month). If Employee voluntarily terminates his employment with the Company for any reason, or if Employee is terminated by the Company for Cause, as defined in paragraph 5(f), Employee shall immediately reimburse to the Company the balance remaining of the Training Cost, by certified or cashier's check. Employee agrees that the unreduced Training Costs for the training services and assistance to the Employee may be deducted from Employee's final check for wages and bonuses, if any.

(c)     No Reimbursement Required if Employee Terminated by Company for Other than Cause. In the event that Company elects to terminate Employee's employment at any time for other than "Cause" (it being understood that the Company has the complete right and discretion to terminate Employee, as an "at-will" employee, at any time, for any reason), Employee shall not be obligated to reimburse the Company for the unforgiven portion of the Training Cost.

7.  <u>Confidential Information</u>.

        (a)    <u>Existence of Confidential Information</u>.  Employee acknowledges and agrees that the Company owns and has developed and compiled, and will develop and compile, certain proprietary techniques and confidential information which have great value to its business (referred to in this Agreement collectively as "Confidential Information").  Confidential Information includes not only information disclosed by the Company to Employee, but also information developed or learned by Employee during the course of employment with the Company.  Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company.  By example and without limitation, Confidential Information includes any and all information concerning trade secrets, techniques (including trading techniques, analyses of options and equity markets), software, processes, formulas, computer programs, innovations, discoveries, improvements, research, development, test results, reports, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, projections, customer and supplier identities, characteristics, and agreements.

        (b)    <u>Protection of Confidential Information</u>.  Employee will not, directly or indirectly, use, make available, sell, disclose, or otherwise communicate to any third party, other than in the course and scope of his or her assigned duties and only for the benefit of the Company, any of the Company's Confidential Information, either during or after employment with the Company.

        (c)    <u>Delivery of Confidential Information</u>.  Upon request by Company management, or when employment with the Company terminates, Employee will immediately deliver to the Company all originals and any copies (whether in paper, electronic, or other form) of any and all materials and writings received from, created for or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

        (d)    <u>Survival</u>.  The obligations under this Section shall survive termination of this Agreement for any reason.

    8.  <u>Exclusive Employment</u>.  During employment with the Company, Employee will not do anything to compete with the Company's present or contemplated business, nor will he or she plan or organize any competitive business activity.  Employee will not enter into any agreement or perform any activity which conflicts with his or her duties or obligations to the Company.  Employee will not during his or her employment or within one (1) year after it ends, directly or indirectly, hire, solicit or encourage to terminate or alter a relationship with the Company, any employee, agent, independent contractor, client, supplier, customer, or consultant of the Company.

    9.  <u>No Inconsistent Obligations</u>.  Employee is aware of no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with his or her undertaking employment with the Company.  Employee will not disclose to the Company, or use, or induce

the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that he or she has returned all property and confidential information belonging to all prior employers.

10. <u>Miscellaneous</u>.

(a)    <u>Entire Agreement</u>. This Agreement, together with any attached exhibits, contains the entire agreement and understanding between the parties hereto and supersedes any prior or contemporaneous written or oral agreements between them respecting the subject matter hereof.

(b)    <u>Amendment</u>. This Agreement may be amended only by a writing signed by Employee and by a duly authorized representative of the Company.

(c)    <u>Severability</u>. If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

(d)    <u>Construction</u>. The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement. The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Employee.

(e)    <u>Remedy for Breach</u>. The parties hereto agree that, in the event of breach or threatened breach of any covenants of Employee pursuant to paragraphs 7, 8 or 9, the damage or imminent damage to the value and the goodwill of the Company's business shall be inestimable, and that therefore any remedy at law or in damages shall be inadequate. Accordingly, the parties hereto agree that the Company shall be entitled to injunctive relief against Employee in the event of any breach or threatened breach of any of such provisions by Employee, in addition to any other relief (including damages) available to the Company under this Agreement or under law.

(f)    <u>Assistance in Litigation</u>. Employee shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become a party.

(i)    Paragraph Headings. All paragraph headings in this Agreement are intended to be illustrative only and should not be relied on for any interpretation.

11. <u>Dispute Resolution</u>.

(a)    <u>Arbitration</u>. Any controversy, claim or dispute arising out of or relating to this Agreement or the employment relationship between Employee and Company, either during the existence of the employment relationship or afterwards, between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be referred to arbitration in

[San Francisco, California.]  Arbitration shall be conducted by and in accordance with the then prevailing arbitration rules of the Judicial Arbitration and Mediation Service.  The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection.

All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; the arbitrator shall apply applicable law in deciding any dispute or determining any award; and shall render a written ruling and rationale for any award; provided however, that nothing in this Section shall be construed as precluding Employee or the Company from bringing an action for injunctive relief or other equitable relief in a matter where the party can show that an injunction or other equitable relief warrants prompt and immediate recourse to a court of competent jurisdiction.

(b)    <u>Confidential Notice of Dispute Resolution</u>.  In any arbitration, the parties shall keep confidential the existence of the claim, controversy or disputes from third parties (other than arbitrator(s)), and the determination thereof, unless otherwise required by law.

(c)    <u>Costs and Reasonable Attorneys' Fees</u>.  Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to arbitration or litigation in connection with this Agreement or Employee's employment with the Company, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to an award of its or their reasonable attorneys' fees and costs in such litigation or arbitration from the non-prevailing party or parties.

If this is acceptable to you, please sign and return to us the executed original of this letter and retain a copy for your file.

Dated: ___7/31/01___

Group One Trading, Ltd.

By: _____
Name:  Julie Schreiner
Title:    Human Resources Manager

Dated: ___7/31/01___

Accepted and Agreed:

_____
Signature of Employee

_____
L. P. DeLuca
Printed Name

# Exhibit E

OHS West:260348138.1

## GROUP ONE TRADING LLC 2005 EMPLOYEE RESTRICTED UNIT PLAN

### RESTRICTED UNIT AGREEMENT

**GROUP ONE TRADING LLC**, a California corporation (the "Company"), hereby awards the number of Restricted Units indicated below to the Participant named below. The terms and conditions of the Award are set forth in this cover sheet, in the attached Restricted Unit Agreement, in the 2005 Employee Restricted Unit Plan (the "Plan") and the Amended and Restated Operating Agreement of the Company, dated as of October 1, 1999, as amended from time to time (the "Operating Agreement").

1. Date of Award:                                                                                       October 1, 2005

2. Name of Participant:                                                                            DELUCA, LAUREN

3. Participant's Social Security Number:                                                  REDACTED

4. Number of Restricted Units Awarded:                                                 2,033

5. Amount Paid by Participant for the Restricted Units Awarded:              42,236

6. Beginning Capital Account:                                                                 42,236

Note to form: If cash consideration is paid, this should be at least the amount of the cash consideration. For Awards granted with no cash consideration, the amount can be zero or any other amount determined by the Committee. The employee will recognize gain on the difference between the cash consideration paid (or zero for no cash consideration grants) and the beginning Capital Account.

7. First Date When Restricted Units May be (a) Transferred or (b) Required to be
Purchased by the Company under Section 8.1A(iv) of the Operating Agreement          September 30, 2008

Note to form: This will be either the third or fifth anniversary of the date of the Award, as determined by the Committee.

California residents only:

8. The undersigned represents and warrants that he or she (a) has a pre-existing personal or business relationship with the Company or any of its officers, directors, controlling persons or managers and (b) is purchasing Restricted Units only for his or her own account, and not with a view to or for sale in connection with any distribution of the Restricted Units.

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Restricted Unit Agreement and in the Plan and the Operating Agreement. You are also acknowledging receipt of this Agreement, a copy of the Plan and a copy of the Operating Agreement.*

Participant: _____
                              (Signature)

Company: _____          _____
                              (Signature)

Title: _____          Chief Financial Officer

Attachment

DOCSSF1:769905.6
8046-1 DYM

## GROUP ONE TRADING LLC EMPLOYEE RESTRICTED UNIT PLAN

### RESTRICTED UNIT AGREEMENT

**GROUP ONE TRADING LLC,** a California corporation (the "Company"), hereby awards the number of Restricted Units indicated below to the Participant named below. The terms and conditions of the Award are set forth in this cover sheet, in the attached Restricted Unit Agreement, in the 2005 Employee Restricted Unit Plan (the "Plan") and the Amended and Restated Operating Agreement of the Company, dated as of October 1, 1999, as amended from time to time (the "Operating Agreement").

1. Date of Award:                                                     October 1, 2006

2. Name of Participant:                                           DELUCA, LAUREN
                                                                              **REDACTED**

3. Participant's Social Security Number:                    — ,

4. Number of Restricted Units Awarded:                   _____ 640 _____

5. Amount Paid by Participant for the Restricted Units Awarded:    # 4 X $44 = _$28,160_

6. Beginning Capital Account:                                # 4 X $44 = _$28,160_

Note to form: If cash consideration is paid, this should be at least the amount of the cash consideration. For Awards granted with no cash consideration, the amount can be zero or any other amount determined by the Committee. The employee will recognize gain on the difference between the cash consideration paid (or zero for no cash consideration grants) and the beginning Capital Account.

7. First Date When Restricted Units May be (a) Transferred or (b) Required to be Purchased by the Company under Section 8.1A(iv) of the Operating Agreement          September 30, 2009

Note to form: This will be either the third or fifth anniversary of the date of the Award, as determined by the Committee.

California residents only:

8. The undersigned represents and warrants that he or she (a) has a pre-existing personal or business relationship with the Company or any of its officers, directors, controlling persons or managers and (b) is purchasing Restricted Units only for his or her own account, and not with a view to or for sale in connection with any distribution of the Restricted Units.

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Restricted Unit Agreement and in the Plan and the Operating Agreement. You are also acknowledging receipt of this Agreement, a copy of the Plan and a copy of the Operating Agreement.*

Participant: _____
                                              (Signature)
Company: _____
                                              (Signature)
Title: _____CFO_____
Attachment

DOCSSF1:769905.6
8046-1 DYM

# Exhibit F

Group One Trading, L.P.
220 Bush Street, Suite 360
San Francisco, CA  94104


                    Re:    Employment Relationship

Dear John Superson:

           This letter shall set forth the terms and conditions between
you ("Employee") and Group One Trading, L.P. and its affiliates (the
"Company") in connection with your employment by the Company.

           1.        Employment.

                (a)        Term.  The Company hereby employs Employee to
serve in such position or positions as the Company may determine in its
sole discretion.  Either party may terminate Employee's employment with
the Company at any time and this agreement is intended to create an "at
will" employment relationship between the parties.

                (b)        Direction.  The Company shall retain full
direction and control of the manner, means and methods by which Employee
performs the services for which he or she is employed hereunder and of the
place or places at which such services shall be rendered.

           2.        Compensation.  Employee shall be paid a base salary
at the initial annual rate of $30,000, payable in installments consistent
with Company's payroll practices.  Payment of all compensation to Employee
hereunder shall be made in accordance with the relevant Company policies
in effect from time to time, including normal payroll practices, and shall
be subject to all applicable employment and withholding taxes.

           3.        Other Employment Benefits.

                (a)        Benefit Plans.  Employee shall be entitled to
participate in the Company's existing health and medical programs pursuant
to their terms and conditions.  Nothing in this Agreement shall preclude
the Company from terminating or amending any employee benefit plan or
program from time to time.

                (b)        Vacation.  Employee shall be entitled to two
(2) weeks of vacation for each year of full employment, exclusive of legal
holidays, provided the scheduling of Employee's vacation does not
interfere with the Company's normal business operations.

                (c)        No Other Benefits.  Employee understands and
acknowledges that the compensation specified in Sections 2 and 3 of this
Agreement shall be in lieu of any and all other compensation, benefits and
plans, and that, in the event an employee benefit plan of any nature is
developed or maintained by the Company in the future, Employee shall have
no right to participate therein by virtue of this Agreement; such right,
if any, shall be granted by the Company in its sole discretion.


SF3-40339.2

4.      <u>Employee's Business Activities</u>.  Employee shall devote his or her professional time, attention and energy substantially to the business and affairs of the Company and its affiliates, as its business and affairs now exist and as they hereafter may be changed, and shall not during the term of his or her employment hereunder be engaged in any other business activity which interferes with the Employee's obligation to the Company.

5.      <u>Training Expenses</u>.

(a)      <u>Expenses</u>.  Company is expected to incur expenses of $50,000 for certain training of Employee (the "Training Cost").

(b)      <u>Reimbursement to Company While Employed</u>. Beginning on the date that Employee is promoted to full market maker, if ever, the Training Cost will be amortized on a straight line basis over a 24 month period (approximately $2,080 per month).  If Employee terminates his employment with the Company for any reason, Employee shall immediately reimburse the Company the unamortized portion of the Training Cost by certified check (or, at the option of the Company, through deduction of any final salary payment owed).

(c)      <u>No Reimbursement Required if Employee Terminated by Company for Other than Cause</u>.  In the event that Company elects to terminate Employee's employment for other than "cause" (it being understood that the Company has the complete right and discretion to terminate Employee for any reason), Employee shall not be obligated to reimburse the Company for the unreimbursed portion of the Training Cost. "Cause" is herein defined to mean:  loss of legal capacity; dishonesty; incompetence; breach by Employee of this Agreement; misconduct; actions by Employee detrimental to Company's reputation; or Employee's conviction of a criminal offense.

6.      <u>Confidential Information</u>.

(a)      <u>Existence of Confidential Information</u>.  The Company owns and has developed and compiled, and will develop and compile, certain proprietary techniques and confidential information which have great value to its business (referred to in this Agreement collectively as "Confidential Information").  Confidential Information includes not only information disclosed by the Company to Employee, but also information developed or learned by Employee during the course of employment with the Company.  Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company.  By example and without limitation, Confidential Information includes any and all information concerning trade secrets, techniques, software, processes, formulas, computer programs, innovations, discoveries, improvements, research, development, test results, reports, specifications, data,

know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, projections, customer and supplier identities, characteristics, and agreements.

        (b)      <u>Protection of Confidential Information</u>. Employee will not, directly or indirectly, use, make available, sell, disclose, or otherwise communicate to any third party, other than in his or her assigned duties and for the benefit of the Company, any of the Company's Confidential Information, either during or after employment with the Company.

        (c)      <u>Delivery of Confidential Information</u>. Upon request or when employment with the Company terminates, Employee will immediately deliver to the Company all copies of any and all materials and writings received from, created for or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

        (d)      <u>Survival</u>. The obligations under this Section shall survive termination of this Agreement for any reason.

        7.      <u>Exclusive Employment</u>. During employment with the Company, Employee will not do anything to compete with the Company's present or contemplated business, nor will he or she plan or organize any competitive business activity. Employee will not enter into any agreement which conflicts with his or her duties or obligations to the Company. Employee will not during his or her employment or within one (1) year after it ends, directly or indirectly, hire, solicit or encourage to terminate or alter a relationship with the Company, any employee, agent, independent contractor, client, supplier, customer, or consultant of the Company.

        8.      <u>No Inconsistent Obligations</u>. Employee is aware of no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with his or her undertaking employment with the Company. Employee will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that he or she has returned all property and confidential information belonging to all prior employers.

        9.      <u>Miscellaneous</u>.

        (a)      <u>Attorneys' Fees</u>. Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to litigation or arbitration in connection with this Agreement or Employee's employment with the Company, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its or their reasonable attorneys' fees and costs in such litigation or arbitration from the non-prevailing party or parties.

        (b)      <u>Entire Agreement</u>. This Agreement, together with the attached exhibits, contains the entire agreement and understanding between the parties hereto and supersedes any prior or

contemporaneous written or oral agreements between them respecting the subject matter hereof.

   (c)  <u>Amendment</u>.  This Agreement may be amended only by a writing signed by Employee and by a duly authorized representative of the Company.

   (d)  <u>Severability</u>.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

   (e)  <u>Construction</u>.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Employee.

   (f)  <u>Remedy for Breach</u>.  The parties hereto agree that, in the event of breach or threatened breach of any covenants of Employee, the damage or imminent damage to the value and the goodwill of the Company's business shall be inestimable, and that therefore any remedy at law or in damages shall be inadequate.  Accordingly, the parties hereto agree that the Company shall be entitled to injunctive relief against Employee in the event of any breach or threatened breach of any of such provisions by Employee, in addition to any other relief (including damages) available to the Company under this Agreement or under law.

   (g)  <u>Assistance in Litigation</u>.  Employee shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become a party.

   (h)  <u>Arbitration</u>.  Any controversy, claim or dispute arising out of or relating to this Agreement or the employment relationship between Employee and Company, either during the existence of the employment relationship or afterwards, between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be settled by arbitration in San Francisco, California.  Arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association.  The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided however, that nothing in this subsection hereof shall be construed as precluding the Company from bringing an action for injunctive relief or other equitable relief.  The parties shall keep confidential the existence of the claim, controversy or

disputes from third parties (other than arbitrator(s)), and the determination thereof, unless otherwise required by law.

      If this is acceptable to you, please sign and return a copy to us of this letter.

Dated: _02-07-99_          Group One, Ltd.

                            By: _____
                            Name: Heidi M. Lettis
                            Title: Director, H. R. Development

Accepted and Agreed:

_____
Signature of Employee

_John H. Superson_
_____
Printed Name

SF3-40339.2

# Exhibit G

The Member of Group One Trading, LLC, a California limited liability company, has executed this Agreement, effective as of the date below.

_____

SIGNATURE

John Superson

MEMBER

05-10-02

DATE


ACCEPTED: R. GREBE  6/14/02


52.

# Exhibit H

## GROUP ONE TRADING LLC

### MEMBER CONSENT TO AMENDMENT NO. 4 TO
### AMENDED AND RESTATED OPERATING AGREEMENT

In accordance with Sections 4.7(A)(iii) and 4.8(H) of that certain Amended and Restated Operating Agreement dated October 1, 1999, as amended (the "Agreement"), of Group One Trading LLC, the undersigned hereby approves the Amendment No. 4 to the Agreement in the form proposed by Group One Trading LLC.

SIGNATURE: _____

SIGNATURE OF JOINT TENANT (IF ANY): _____

NAME OF MEMBER (please print): John Superson _____

DATE: 2-15-05 _____

# Exhibit I



440 S. LaSalle Street, Suite 3232
Chicago, IL  60605

April 18, 2005

Mr. Stanton Todd
1870 N. Hoyne
Chicago, IL  60647

Re:     Employment Agreement

Dear Stanton:

This letter shall set forth the terms and conditions between you ("you", "your" or "Employee") and
Group One, LP and its affiliates (the "Company") in connection with your employment by the
Company.

1.  Scope of Employment.

    (a) Direction.  The Company hereby employs Employee to serve in such position or positions as
        the Company may determine in its sole discretion.  The Company shall retain full direction
        and control of the manner, location, means and methods by which you perform the services
        for which you are employed hereunder.

2.  Compensation.

    (a) Trader Compensation.  Employee shall be paid, an annual recoverable draw of $40,000, and
        shall also be eligible for a tiered bonus payout on trading profits beginning at 40%.

3.  Other Employment Benefits.

    (a) Benefit Plans.  Employee shall be entitled to participate in the Company's existing health
        and medical programs pursuant to their terms and conditions.  Nothing in this Agreement
        shall preclude the Company from amending, adding or terminating any employee benefit
        plan or program.

    (b) Vacation.  As a trader, Employee shall be entitled to three (3) weeks of vacation for each
        year of full employment, exclusive of legal holidays, provided the scheduling of Employee's
        vacation does not interfere with the Company's normal business operations.  Upon tenure,
        Employee will be entitled to vacation pursuant to the terms set forth in the employee
        handbook.

    (c) Employee understands and acknowledges that the compensation and benefits specified in
        Sections 2 and 3, respectively, of this Agreement shall be in lieu of any and all other

compensation, benefits and plans, and that, in the event an employee benefit plan of any nature is developed or maintained by the Company in the future, Employee shall have no right to participate therein by virtue of this Agreement; such right, if any, shall be granted by the Company in its sole discretion.

4.  Employee's Business Activities. Employee shall devote his or her professional time, attention and energy substantially to the business and affairs of the Company, as its business and affairs now exist and as they hereafter may be changed, and shall not during the term of his or her employment hereunder be engaged in any other business activity which interferes with or otherwise conflicts with the Employee's obligation to the Company.

5.  Employment Status and Termination of Employment.

(a) At-will Employment. Employee's employment under this Agreement is and will remain, at all times, "at-will." This means that Employee or the Company may terminate this Agreement, and the employment relationship, at any time, for any reason, with or without cause and with or without notice.

(b) Change in "At-will" Status. Any change to Employee's at-will status can only occur if it is contained in a writing signed by Employee and the Company's Director of Human Resources.

(c) In the event that Employee voluntarily terminates employment for any reason, Employee shall only be entitled under this Agreement to base salary earned, and to accrued but unused vacation, through the date employment terminates.

(d) In the event that Employee is terminated by the Company, other than for Cause, as defined in paragraph 5(f) below, Employee shall be paid base salary through the date of termination, as well as accrued vacation. Payment of a bonus, if any, shall be made pursuant to the Trader Compensation and Bonus Plan referenced in Appendix A.

(e) If Employee is terminated for Cause, as defined in paragraph 5(f) below, Employee shall only be entitled to payment of any salary and accrued vacation owed to Employee as of the date of termination. Payment of a bonus, if any, shall be made pursuant to the Trader Compensation and Bonus Plan.

(f) "Cause" is herein defined to mean: loss of legal capacity to trade, or a determination by the Company of any of the following: misconduct, dishonesty, gross negligence or unsatisfactory performance by the Employee; breach by Employee of paragraphs 4, 6, 7 or 8 of this Agreement; actions by Employee detrimental to Company's business interests or its reputation; failure or refusal to follow reasonable directions from management; or Employee's conviction of a criminal offense.

(g) Except as provided herein, Employee shall not be entitled to any other compensation.

6.  Confidential Information.

(a) Existence of Confidential Information. Employee acknowledges and agrees that the Company owns and has developed and compiled, and will develop and compile, certain

proprietary techniques and confidential information which have great value to its business (referred to in this Agreement collectively as "Confidential Information"). Confidential Information includes not only information disclosed by the Company to Employee, but also information developed or learned by Employee during the course of employment with the Company. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company. By example and without limitation, Confidential Information includes any and all information concerning trade secrets, techniques (including trading techniques, analyses of options and equity markets), software, processes, formulas, computer programs, innovations, discoveries, improvements, research, development, test results, reports, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, projections, customer and supplier identities, characteristics, and agreements.

(b) <u>Protection of Confidential Information</u>. Employee will not, directly or indirectly, use, make available, sell, disclose, or otherwise communicate to any third party, other than in the course and scope of his or her assigned duties and only for the benefit of the Company, any of the Company's Confidential Information, either during or after employment with the Company.

(c) <u>Delivery of Confidential Information</u>. Upon request by Company management, or when employment with the Company terminates, Employee will immediately deliver to the Company all originals and any copies (whether in paper, electronic, or other form) of any and all materials and writings received from, created for or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

(d) <u>Survival</u>. The obligations under this Section shall survive termination of this Agreement for any reason.

7. <u>Exclusive Employment</u>. During employment with the Company, Employee will not do anything to compete with the Company's present or contemplated business, nor will he or she plan or organize any competitive business activity. Employee will not enter into any agreement or perform any activity which conflicts with his or her duties or obligations to the Company. Employee will not during his or her employment or within one (1) year after it ends, directly or indirectly, hire, solicit or encourage to terminate or alter a relationship with the Company, any employee, agent, independent contractor, client, supplier, customer, or consultant of the Company.

8. <u>No Inconsistent Obligations</u>. Employee is aware of no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with his or her undertaking employment with the Company. Employee will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that he or she has returned all property and confidential information belonging to all prior employers.

9. Miscellaneous.

   (a) Entire Agreement. This Agreement, together with any attached exhibits, contains the entire agreement and understanding between the parties hereto and supersedes any prior or contemporaneous written or oral agreements between them respecting the subject matter hereof.

   (b) Amendment. This Agreement may be amended only by a writing signed by Employee and by a duly authorized representative of the Company.

   (c) Severability. If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

   (d) Construction. The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement. The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Employee.

   (e) Remedy for Breach. The parties hereto agree that, in the event of breach or threatened breach of any covenants of Employee pursuant to paragraphs 7, 8 or 9, the damage or imminent damage to the value and the goodwill of the Company's business shall be inestimable, and that therefore any remedy at law or in damages shall be inadequate. Accordingly, the parties hereto agree that the Company shall be entitled to injunctive relief against Employee in the event of any breach or threatened breach of any of such provisions by Employee, in addition to any other relief (including damages) available to the Company under this Agreement or under law.

   (f) Assistance in Litigation. Employee shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become a party.

   (g) Paragraph Headings. All paragraph headings in this Agreement are intended to be illustrative only and should not be relied on for any interpretation.

10. Dispute Resolution.

   (a) Arbitration. Any controversy, claim or dispute arising out of or relating to this Agreement or the employment relationship between Employee and Company, either during the existence of the employment relationship or afterwards, between the parties hereto, their assignees, their affiliates, their attorneys, or agents, shall be referred to arbitration. Arbitration shall be conducted by and in accordance with the then prevailing arbitration rules of the Judicial Arbitration and Mediation Service. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having

jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection.

All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; the arbitrator shall apply applicable law in deciding any dispute or determining any award; and shall render a written ruling and rationale for any award; provided however, that nothing in this Section shall be construed as precluding Employee or the Company from bringing an action for injunctive relief or other equitable relief in a matter where the party can show that an injunction or other equitable relief warrants prompt and immediate recourse to a court of competent jurisdiction.

(b) Confidential Notice of Dispute Resolution.  In any arbitration, the parties shall keep confidential the existence of the claim, controversy or disputes from third parties (other than arbitrator(s)), and the determination thereof, unless otherwise required by law.

(c) Costs and Reasonable Attorneys' Fees.  Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to arbitration or litigation in connection with this Agreement or Employee's employment with the Company, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to an award of its or their reasonable attorneys' fees and costs in such litigation or arbitration from the non-prevailing party or parties.

If this is acceptable to you, please sign and return to us the executed original of this letter and retain a copy for your file.


Group One Trading, LP


By: _____
Name:  Heidi M. Robertson
Title:    Managing Director, Human Resources


Accepted and Agreed:

_____        _4/18/05_____
Signature of Employee                                    Date


_____
Stanton Todd

# Exhibit J

## GROUP ONE TRADING LLC EMPLOYEE RESTRICTED UNIT PLAN

### RESTRICTED UNIT AGREEMENT

**GROUP ONE TRADING LLC,** a California corporation (the "Company"), hereby awards the number of Restricted Units indicated below to the Participant named below. The terms and conditions of the Award are set forth in this cover sheet, in the attached Restricted Unit Agreement, in the 2005 Employee Restricted Unit Plan (the "Plan") and the Amended and Restated Operating Agreement of the Company, dated as of October 1, 1999, as amended from time to time (the "Operating Agreement").

1. Date of Award:                                            October 1, 2006

2. Name of Participant:                                    TODD, CORY
                                                                              **REDACTED**
3. Participant's Social Security Number:

4. Number of Restricted Units Awarded:                      _225_

5. Amount Paid by Participant for the Restricted Units Awarded:    # 4 X $44 = _# 9,900_

6. Beginning Capital Account:                               # 4 X $44 = _# 9,900_

Note to form:  If cash consideration is paid, this should be at least the amount of the cash consideration. For Awards granted with no cash consideration, the amount can be zero or any other amount determined by the Committee. The employee will recognize gain on the difference between the cash consideration paid (or zero for no cash consideration grants) and the beginning Capital Account.

7. First Date When Restricted Units May be (a) Transferred or (b) Required to be
Purchased by the Company under Section 8.1A(iv) of the Operating Agreement    September 30, 2009

Note to form:  This will be either the third or fifth anniversary of the date of the Award, as determined by the Committee.

California residents only:

8. The undersigned represents and warrants that he or she (a) has a pre-existing personal or business relationship with the Company or any of its officers, directors, controlling persons or managers and (b) is purchasing Restricted Units only for his or her own account, and not with a view to or for sale in connection with any distribution of the Restricted Units.

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Restricted Unit Agreement and in the Plan and the Operating Agreement. You are also acknowledging receipt of this Agreement, a copy of the Plan and a copy of the Operating Agreement.*

Participant: _____
                                              (Signature)
Company: _____
                                              (Signature)
Title:_____
      CFO
Attachment

DOCSSP1:769905.6
8046-1 DYM

# Exhibit K

## GROUP ONE TRADING LLC

### MEMBER CONSENT TO AMENDMENT NO. 4 TO
### AMENDED AND RESTATED OPERATING AGREEMENT

In accordance with Sections 4.7(A)(iii) and 4.8(H) of that certain Amended and Restated Operating Agreement dated October 1, 1999, as amended (the "Agreement"), of Group One Trading LLC, the undersigned hereby approves the Amendment No. 4 to the Agreement in the form proposed by Group One Trading LLC.

SIGNATURE: _____

SIGNATURE OF JOINT TENANT (IF ANY): _____

NAME OF MEMBER (please print): _Stanton Todd_ _____

DATE: _3/17/05_ _____

DOCSSF1:600739.1
8040-1 DYM

# Exhibit L

OHS West:260348138.1

All of the Members of Group One Trading LLC, a California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBER:

John Bertolero

MEMBER:

John Petrin

MEMBER:

_____

MEMBER:

_____

MEMBER:

_____

# Exhibit M

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REG# **TXu 1 – 315 – 158**

EFFECTIVE DATE OF REGISTRATION

**7/12/06**
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**
TRADING SCRIPT SUITE

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   Title of Collective Work ▼

If published in a periodical or serial give:   Volume ▼     Number ▼     Issue Date ▼     On Pages ▼

**2**

a   **NAME OF AUTHOR ▼**
GROUP ONE TRADING, LP.

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼
N/A

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ U.S.A.
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
ENTIRE SCRIPT SUITE/COMPUTER PROGRAM

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

b   **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

c   **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

a   **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
2006   ◀ Year

b   **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶     Day ▶     Year ▶     ◀ Nation

**4**

See instructions before completing this space.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
GROUP ONE TRADING, LP
220 BUSH STREET, SUITE #360, SAN FRANCISCO, CA 94104

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**APPLICATION RECEIVED**
JUL 1 2 2006
**ONE DEPOSIT RECEIVED**
JUL 1 2 2006
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

**DO NOT WRITE HERE**
Page 1 of _____ pages

| EXAMINED BY | _wℓↃ_ | FORM TX |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▶                    Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**

Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**6**

See instructions before completing this space.

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼                    Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/ZIP ▼

HEIDI ROBERTSON, MANAGING DIRECTOR- HR
220 BUSH STREET, SUITE #360, SAN FRANCISCO, CA  94104

**b**

Area code and daytime telephone number ▶ 415-283-3406                    Fax number ▶ 415-283-3501

Email ▶ HEIDI.ROBERTSON@GROUP1.COM

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ▶ ☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of GROUP ONE TRADING, LP

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

HEIDI ROBERTSON                    Date ▶ 07/06/2006

Handwritten signature (X) ▼

X _____

| Certificate will be mailed in window envelope to this address: | Name ▼ ATTN: HEIDI ROBERTSON- GROUP ONE TRADING,LP | |
|---|---|---|
| | Number/Street/Apt ▼ 220 BUSH STREET, SUITE #360 | |
| | City/State/ZIP ▼ SAN FRANCISCO, CA  94104 | |

• Complete all necessary spaces
• Sign your application in space 8

1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

Library of Congress
Copyright Office - TX
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: July 2003—xxx   Web Rev: July 2003   ♻ Printed on recycled paper                    U.S. Government Printing Office: 2000-461-113/20,081

# Exhibit N

-----Original Message-----
**From:** Greg.Miller@group1.com [mailto:Greg.Miller@group1.com]
**Sent:** Sunday, July 01, 2007 8:00 AM
**To:** G1-AllEmployees@group1.com
**Subject:** Confidentiality with Group One Tools, Scripts, and Settings

We want to make sure that everyone understands that all of our Tools, Scripts and settings are confidential and not to be disclosed.

Never send our Aqtor Scripts, Script Documentation or Kitchen Sink Documentation to anyone outside of Group One. They are confidential and contain proprietary copyrighted material that should never be distributed. We invest a lot in creating and testing our scripts and tools. We do not want anyone else to take advantage of this investment.

**Working with Actant**

In the course of working with Actant, they may ask you for copies of our scripts and/or details about how they work. If this level of detail is needed to resolve an issue, please escalate it to Colin or myself.

We can share the relevant information while limiting the risk of sharing confidential information. We have a non-disclosure agreement with Actant that should prevent them from deliberately using our code or ideas, but the nature of their business is that they want all of their customers to have the best quoting system possible. We don't want to give them the opportunity to mistakenly share our scripts with our competitors.

**Things to avoid**

- Talking about settings with phrases like '                      **REDACTED**
  ' or anything else that might give insight into how we trade. This applies to dealing with Actant as well as when traders from other firms are listening.
- Forgetting to remove the scripting portion of the Aqtor Incident Report before forwarding it on to Actant.
- Letting someone from Actant or the Exchange have unmonitored access to our machines. Non-Group One people should never need to save something to a memory stick from our machines without being supervised.
- Leaving copies of the Script Guide, Aqtor PE Sheet or Kitchen Sink Tool Guide Documents lying around.
- Forwarding on e-mails that contain details of how our scripts and tools work.

Please let me know if you have any questions.

Thanks,
-Greg

Greg Miller
greg.miller@group1.com
(215) 701-7919

# Exhibit O

# Group One Trading LP Employee Handbook

**We are very happy to welcome you to Group One Trading, L.P.**

**You have joined an organization that has established itself, and has earned a reputation, as a leader in the derivatives trading arena.**

**This manual is meant to provide answers to most of the questions you may have regarding Group One's policies and procedures. The policies in this manual are to be considered guidelines. It is not a contract nor is it in any part a contractual agreement between the Company and its employees or applicants for employment. It does not serve as an agreement or guarantee of employment terms, conditions or duration. As an "employer-at-will", it is your right as an employee of Group One Trading, L.P. to terminate your employment at any time. The Company reserves the same right to terminate your employment, with or without notice or cause.**

**Group One Trading, L.P., at its option, may change, delete, suspend, or discontinue any part or parts of the policies in this Manual at any time without prior notice.**

**The Human Resources Department will be able to answer any questions you may have regarding this manual.**

**We hope that your association with us will be a mutually beneficial and pleasant one.**

**Revised April 2007**

Copyright © 2005 Group One Trading, LP.
All Rights Reserved.

# Table of Contents

1. EMPLOYMENT GUIDELINES & POLICIES ........................................................ 4
   a. "At Will" Employment................................................................................ 4
   b. Confidential Information............................................................................ 4
   c. Confidentiality and Speaking with the Media........................................... 4
   d. Conflict of Interest.................................................................................... 4
   e. Drug-free Workplace Policy ...................................................................... 5
   f. Equal Employment Opportunity ................................................................ 5
   g. Ethics ........................................................................................................ 6
   h. Harassment .............................................................................................. 6
   i. Performance & Standards of Conduct ...................................................... 6
   j. Personnel Performance Reviews .............................................................. 7
   k. Resolution of Employment Disputes ........................................................ 7
   l. Workplace Location................................................................................... 8
   m. Working Hours ......................................................................................... 8
   n. Dress Code/Personal Appearance .......................................................... 8

2. GROUP ONE BENEFITS........................................................................................ 8
   a. Employment Status and Classification ..................................................... 8
      Full-time Employee ................................................................................... 9
      Part-time Employee .................................................................................. 9
      Temporary Employee ............................................................................... 9
      On Leave................................................................................................... 9
      Employment-at-will ................................................................................... 9
   b. The Benefits Package ............................................................................... 9
   c. Paid Time Off (Legal Holidays) ............................................................... 10
   d. Vacation.................................................................................................. 10
      Clerks (all levels, including Trader Trainees, Jr. Traders) .................... 11
      Traders .................................................................................................... 11
      Administration/Management/Office Staff ............................................... 11
      For purposes of Vacation, the following apply....................................... 11
      Vacation Accrual Schedule for Full-time Staff ....................................... 12
   e. Personal Days ......................................................................................... 12
   f. Sick Days................................................................................................. 12
   g. Leaves of Absence ................................................................................. 13
      Disability (Including Pregnancy) Leave of Absence............................... 13
      Family and Medical Leave ...................................................................... 14
      Military Reserves or National Guard Leave of Absence......................... 15
      Personal Leaves of Absence .................................................................. 15
      Jury and Witness Duty ............................................................................ 16
      Bereavement Leave ................................................................................ 16
   h. Medical/Dental Insurance Coverage ...................................................... 16
      Choosing Coverage / Open Enrollment .................................................. 17
      Changes to Existing Coverage ............................................................... 17
      Dental...................................................................................................... 17
      Medical Plans .......................................................................................... 18
      Employee Assistance Program................................................................ 19
      Health / Dependent Care Flexible Spending Accounts (Section 125)..... 19
   i. Protection Plans ...................................................................................... 19
   j. Government Required Coverage.............................................................. 20
   k. 401(k) Retirement Plan ........................................................................... 21
   l. Employee Referral Program....................................................................22

Copyright © 2005 Group One Trading, LP.
All Rights Reserved.

3. MISCELLANEOUS POLICIES ................................................................ 23
   a. Human Resources Administration/Privacy ................................... 23
   b. Software Code of Ethics .......................................................... 24
   c. Online Access Policy ................................................................ 24
   d. Email Etiquette ....................................................................... 25
   e. Intellectual Property ............................................................... 27
   f. Insider Trading and Personal Security Accounts ......................... 28
   g.    Anti-Money Laundering Program ........................................ 29
   h. Education ................................................................................ 29
   i.  Reimbursable Expenses ........................................................... 31
   j.  Risk Desk ................................................................................ 32

Copyright © 2005 Group One Trading, LP.
All Rights Reserved.

# 1. EMPLOYMENT GUIDELINES & POLICIES

The contents of this Handbook represent policies and guidelines to assist employees and managers in understanding generally what is expected of them. However, this Handbook is not intended to form any contractual obligation. Since employment involves many different circumstances, this Handbook is intended for general guidelines only. Management reserves the right to take any and all actions it deems appropriate, in the best interests of the Company.

## a. "At Will" Employment

The employment relationship between Group One Trading, L.P. and all employment is at-will; that is, either the employee, or the Company, can terminate the employment relationship at any time, for any reason, with or without cause or notice. Nothing in these personnel policies is intended to alter the at-will relationship or to establish a contract of employment. Any alteration of the at-will relationship can only be made, in writing, signed by both an Officer (Principal) of the Company and by the employee.

## b. Confidential Information

Employees will not communicate to any third party (other than in his/her assigned duties and for the benefit of the Company) any of Group One Trading, L.P.'s confidential information, either while employed or after employment with the Company.

Confidential information includes all non-public information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information whose unauthorized disclosure could be detrimental to the Company.  No Group One employee shall directly or indirectly use any confidential information for personal gain.

No Group One employee shall directly or indirectly use any non-public information in the execution of securities transactions. On this point, Group One employees will be required to understand and follow securities laws and exchange rules relating to "insider information" and "conflicts of interest." No one is permitted to remove or make copies of any Company records, reports, or documents without prior management approval.

## c. Confidentiality and Speaking with the Media

No employee is permitted to speak with the media, or other such party, who may be seeking information on the Company, without first receiving approval from the principals of the firm. In general all calls from the media should be directed to John Gilmartin or Ben Londergan, in our corporate office.

## d. Conflict of Interest

Employees shall avoid actual or potential conflicts of interest.  Conflict of interest can result from a personal or romantic involvement with a competitor, supplier, co-worker, or subordinate which impairs, or may be perceived as impairing, an employee's ability to exercise good judgment.

An employee involved in any of the relationships described above should immediately disclose the relevant circumstances to his/her supervisor. If an actual or potential conflict is

Copyright © 2005 Group One Trading, LP.
All Rights Reserved.

- Marital Status
- Number of dependents
- Change of beneficiary
- W-4 exemptions

- Emergency contact
- Legal name
- Home address/telephone

## b. Software Code of Ethics

Unauthorized duplication of copyrighted computer software violates the law and is contrary to our organization's standards of conduct. We disapprove of such copying and recognize the following principles as a basis for preventing its occurrences:

- We will neither engage in nor tolerate the making or using of unauthorized software copies under any circumstances.

- We will provide legally acquired software to meet the legitimate software needs in a timely fashion and in sufficient quantities for all our computers.

- We will comply will all license or purchase terms regulating the use of any software we acquire or use.

- We will enforce strong internal controls to prevent the making or using of unauthorized software copies, including effective measures to verify compliance with these standards and appropriate disciplinary measures for violation of these standards.

## c. Online Access Policy

Group One Trading, L.P. provides its employees with computer equipment and/or online access to networks including the Internet.

Your computer equipment and online access at the Company is subject to the following general conditions (this list is not all-inclusive):
- You may not use your computer equipment, electronic mail (e-mail), or online access provided by the Company for any purpose which violates the law, such as but not limited to:
- Gaining unauthorized access to or intentionally damaging other computer systems or networks or the information contained within them.
- Committing criminal acts of any kind.
- Sending harassing, obscene or threatening messages or content, either to Company employees or to anyone else.

FTP-File Transfer Protocol, often integrated into World Wide Web use, is a quick and easy means of transferring files such as documents, programs and images, to and from remote computers. In using FTP or other file retrieval methods, the following restrictions apply:

- To protect the Company from infringement actions and other damage, you may not download and save material from any online service; however retrieved, unless (a) the material is legally permitted to be downloaded without violation of copyright or trademark and (b) all downloaded

*Courtesy*
- **Use email in a professional manner.** Remember, you cannot control where your message might be sent.
- **Get to the point quickly.** The most important statements should appear in the first paragraph. Details can follow in subsequent paragraphs.
- **No flaming please.** These are messages sent in anger. Messages sent in the heat of the moment generally only exacerbate the situation and are usually regretted later. Settle down and think about it for a while before starting a flame war. Review the message after you have had time to calm down.

*Security and Policies*
- **Do not send or forward emails containing libelous, defamatory, offensive, racist, obscene, harassing or threatening remarks.** Remember that all laws governing copyright, defamation, discrimination and other forms of written communication also apply to email. Never abuse e-mail technology by engaging in harassment of a sexual, racial or other nature that violates civil rights laws.
- **Do not forward virus hoaxes and chain letters.** If you receive an email message warning you of a new unstoppable virus that will immediately delete everything from your computer, this is most probably a hoax. By forwarding hoaxes you use valuable bandwidth and sometimes virus hoaxes contain viruses themselves, by attaching a so-called file that will stop the dangerous virus. The same goes for chain letters that promise incredible riches or ask your help for a charitable cause. Even if the content seems to be bona fide, the senders are usually not. We can safely say that all of them are hoaxes. Just delete the letters as soon as you receive them.
- **Do not leave your email account open when you leave your computer.** Anyone could sit down at your keyboard and send out any libelous/ offensive/embarrassing message under your name.
- **Never give your User ID or password to another person.**
- **E-mail messages are permanent.** Even though you may delete the message from your computer to free up storage space, computer experts may retrieve the message from the system.
- **Do not reply to spam.** By replying to spam or by unsubscribing, you are confirming that your email address is 'live'. Confirming this will only generate even more spam. Therefore, just hit the delete button or use email software to remove spam automatically.

## e. Intellectual Property

### Inventions, Designs, Software and Program Development

Group One Trading, L.P. encourages the creation and development of new software, programs, designs, and the like, for the betterment of the firm. It is the responsibility of each individual, both regular staff and independent contractors (referred to as "Individual"), to disclose all inventions and software development made while in the employ or services of Group One Trading, L.P.

1a. As an employee, you agree to promptly disclose to Group One Trading, L.P. in writing the existence and nature of any invention that you may have created. Group One Trading, L.P. will maintain all such disclosures in confidence. Group One Trading, L.P. and you understand that all inventions made by you prior to your employment with Group One Trading, L.P. or its affiliates are excluded from the scope of this

policy/agreement. As a matter of record, you must list such prior inventions with Human Resources. You represent and covenant that such list is complete.

1b. As an employee, you further agree that, except for inventions covered by paragraph (1a) of this policy, all inventions created while you are employed by Group One Trading, L.P. and utilizing Group One resources are the sole property of Group One Trading, L.P. You hereby assign to Group One Trading, L.P. all right, title and interest which you may now have or later acquire in inventions which are not subject to paragraph (1a). If requested by Group One Trading, L.P. You acknowledge this assignment and deliver any instruments confirming Group One Trading, L.P. ownership of all such inventions. Additionally, you will execute whatever documents may be necessary for obtaining patents, copyrights or trademarks in the inventions owned by Group One Trading, L.P. You will cooperate with Group One Trading, L.P. in the prosecution or defense of any patent claims or copyright claims or any litigation or other proceeding involving an invention covered by this paragraph (1b), at Group One Trading, L.P.'s expense.

2. Company's Remedies: You acknowledge that your failure to comply with this agreement may be brought before a court of law. In these instances, the Company may seek damages, including, but not limited to, all costs associated with such litigation.

## f. Insider Trading and Personal Security Accounts

All employees of Group One are eligible to maintain personal securities accounts. Group One is required to establish, maintain, and enforce policies and procedures to prevent the misuse of material non-public information ("inside information"). These requirements are included in the Insider Trading and Securities Fraud Enforcement Act of 1988. The Firm has established policies and procedures reasonably designed to prevent the misuse of inside information considering the Firm's business, structure, size and other relevant factors.

***Personal Security Accounts***
Any employee who opens such an account must report to the Director of Human Resources Development or the Chief Financial Officer the following information:

    a.    The brokerage house and address where the account is domiciled.
    b.    The account name.
    c.    The account number.

Group One is required to receive duplicate copies of all trade confirmations and monthly account activity, and will contact the brokerage house directly to receive this information.

Each employee must fill out an annual update form and is also required to inform their Human Resources Representative of changes throughout the year including both adding accounts **as well as** closing accounts.

ALL TRADING IN PERSONAL ACCOUNTS IS PROHIBITED UNTIL GROUP ONE HAS BEEN NOTIFIED OF THE ACCOUNT OPENING.

# Exhibit P



# GROUP ONE
## T R A D I N G   L P

## EMPLOYEE HANDBOOK
## ACKNOWLEDGMENT FORM

I have read the employee handbook (Revised July 2000) and I understand, and will adhere, to the policies of Group One Trading, L.P.

Print Name: _Lauren Deluca_

Signature: _Lauren DeLuca_

Date: _7/31/01_

Revised July 2000



## EMPLOYEE HANDBOOK
## ACKNOWLEDGMENT FORM

I have read the employee handbook (Revised July 2004) and I understand, and will adhere, to the policies of Group One Trading, L.P.

Print Name: _Lauren DeLuca_

Signature: _[signature]_

Date: _7/26/04_

# Exhibit Q

OHS West:260348138.1

*John*

# GROUP ONE
## T R A D I N G   L P

## EMPLOYEE HANDBOOK
## ACKNOWLEDGMENT FORM

I have read the employee handbook (Revised July 2004) and I understand, and will adhere, to the policies of Group One Trading, L.P.

Print Name: *John Petrizzo*

Signature: _____

Date: *17 Feb 2005*

Revised July 2004

# Exhibit R



# EMPLOYEE HANDBOOK
# ACKNOWLEDGMENT FORM

I have read the employee handbook (Revised July 2004) and I understand, and will adhere, to the policies of Group One Trading, L.P.

Print Name: _Lawrence Spieldenner_

Signature: _Larry Spieldenner_

Date: _7/26/04_

Revised July 2000

**Handbook Acknowledgment**

I have read the employee handbook and understand the policies of Group One Trading LP.


_____     _____7/17/2000_____
Signature                                                     Date

_____
Print Name

# Exhibit S

OHS West:260348138.1



# EMPLOYEE HANDBOOK
# ACKNOWLEDGMENT FORM

I have read the employee handbook (Revised July 2004) and I
understand, and will adhere, to the policies of Group One Trading,
L.P.

Print Name: _John Supersor_

Signature: _____

Date: _7-2/6-04_

Revised July 2000

Handbook Acknowlegement

I have read the employee handbook and understand the policies of Group One, Ltd.

_____                    06-01-98
Signature                                           _____
                                                    Date

_John H. Superson_____
Print name

Handbook Acknowlegement

I have read the employee handbook and understand the policies of
Group One, Ltd.

_John H. Super_____          _3-27-97_____
Signature                                 Date

_John H. Superson_____
Print name

# Exhibit T

OHS West:260348138.1



## EMPLOYEE HANDBOOK
## ACKNOWLEDGMENT FORM

I have read the employee handbook (Revised July 2004) and I understand, and will adhere, to the policies of Group One Trading, L.P.

Print Name: _Stanton Tadd_

Signature: _(signature)_

Date: _4/14/05_

Handbook Acknowlegement

I have read the employee handbook and understand the policies of
Group One, Ltd.


_Signature_

_Date_ 10/11/96


Stanton Todd    (Cory)
Print name

# Exhibit U

# GROUP ONE
## T R A D I N G    L P

# SOFTWARE CODE OF ETHICS
# ACKNOWLEDGMENT FORM

I have read the Software Code of Ethics. I understand them and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _Lauren Peluca_

Signature: _____

Date: _8/27/07_

Updated 07/07

# Exhibit V



# SOFTWARE CODE OF ETHICS
# ACKNOWLEDGMENT FORM

I have read the Software Code of Ethics. I understand them and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _Lawrence Spielberger_

Signature: _____

Date: _8/27/07_

Updated 07/07

# Exhibit W

OHS West:260348138.1



# SOFTWARE CODE OF ETHICS
## ACKNOWLEDGMENT FORM

I have read the Software Code of Ethics. I understand them and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _Joh Siperson_

Signature: _[signature]_

Date: _9-18 07_

Updated 07/07

# Exhibit X

OHS West:260348138.1



# SOFTWARE CODE OF ETHICS
# ACKNOWLEDGMENT FORM

I have read the Software Code of Ethics. I understand them and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _Stanton Todd_

Signature: _____

Date: _9/18/07_

Updated 07/07

# Exhibit Y

OHS West:260348138.1



# GROUP ONE
### T R A D I N G   L P

## WRITTEN SUPERVISORY PROCEDURES
## ACKNOWLEDGMENT FORM

I have read the Written Supervisory Procedures (WSPs") which includes the Anti-Money Laundering Program ("AML"). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, LP.

I understand the Written Supervisory Procedures and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _____*Lauren Deluca*_____

Signature: _____

Date: _____*8/27/07*_____



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2005). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _Lauren DeLuca_

Signature: _DeLuca_

Date: _3/22/05_

Revised March 2005



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2004). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _Lauren DeLuca_

Signature: _LP DeLuca_

Date: _3/29/04_

Revised March 2004



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read the written supervisory procedures (Revised June 2003) and I understand, and will adhere, to the policies and procedures of Group One Trading, L.P.

Print Name: _Lauren DeLuca_

Signature: _____

Date: _7/2/03_

# Exhibit Z

OHS West:260348138.1



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read the Written Supervisory Procedures (WSPs") which
includes the Anti-Money Laundering Program ("AML"). I have and will
continue to comply with such policies, procedures, and the AML
Program of Group One Trading, LP.

Print Name: _____ John Petra _____

Signature: _____

Date: _____ 9/8/05

# GROUP ONE
## T R A D I N G   L P

## WRITTEN SUPERVISORY PROCEDURES
## ACKNOWLEDGEMENT FORM

I have read and understood the Written Supervisory Procedures, which includes the Anti-Money Laundering program ("AML") (Revised March 2005). I have and will continue to comply with such policies, procedures, and the AML program of Group One Trading, L.P.

Print Name: _____John Petrino_____

Signature: _____

Date: _____4/1/2005_____

Revised March 2005



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2004). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _John Petrizzo_

Signature: _____

Date: _13 Oct 2004_

Revised March 2004

# Exhibit AA



## WRITTEN SUPERVISORY PROCEDURES
## ACKNOWLEDGMENT FORM

I have read the Written Supervisory Procedures (WSPs") which includes the Anti-Money Laundering Program ("AML"). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, LP.

I understand the Written Supervisory Procedures and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _Lawrence Spieldenner_

Signature: _Larry Spieldenner_

Date: _8/24/07_



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2005). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _Lawrence Spieldenner_

Signature: _Lawrence Spieldenner_

Date: _3/22/05_

Revised March 2005



## WRITTEN SUPERVISORY PROCEDURES
## ACKNOWLEDGMENT FORM

I have read the written supervisory procedures (Revised June 2003)
and I understand, and will adhere, to the policies and procedures of
Group One Trading, L.P.

Print Name: _Lawrence Spieldenner_

Signature: _Larry Spieldenner_

Date: _7/1/03_

# Exhibit BB

OHS West:260348138.1



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read the Written Supervisory Procedures (WSPs") which includes the Anti-Money Laundering Program ("AML"). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, LP.

I understand the Written Supervisory Procedures and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _John Separser_

Signature: _____

Date: _8-18-07_



# WRITTEN SUPERVISORY PROCEDURES
## ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2005). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _John Superson_

Signature: _John_

Date: _3-30-05_

Revised March 2005

*Superson*



# GROUP ONE
## T R A D I N G   L P

# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2004). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _John Superson_

Signature: _(signature)_

Date: _03-30-04_

Revised March 2004



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read the written supervisory procedures (Revised June 2003) and I understand, and will adhere, to the policies and procedures of Group One Trading, L.P.

Print Name: _John Superson_

Signature: _John Superson_

Date: _07-07-03_

# Exhibit CC

OHS West:260348138.1



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read the Written Supervisory Procedures (WSPs") which includes the Anti-Money Laundering Program ("AML"). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, LP.

I understand the Written Supervisory Procedures and will abide by them. I also understand that failure to do so will lead to disciplinary actions, as stated in Section 11.1 of the WSPs.

Print Name: _____

Signature: _____

Date: _____



# WRITTEN SUPERVISORY PROCEDURES
# ACKNOWLEDGMENT FORM

I have read and understood the written supervisory procedures, which includes the anti-money laundering Program ("AML") (Revised March 2005). I have and will continue to comply with such policies, procedures, and the AML Program of Group One Trading, L.P.

Print Name: _Stanton  Todd_

Signature: _____

Date: _4/18/05_

Revised March 2005