UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

Group One Trading LP,

Plaintiff,

v.

Lauren DeLuca, Lawrence Spieldenner, John Superson and Stanton Todd,

Defendants.

No. 07 C 6881

Judge Virginia Kendall

Magistrate Judge Cox

**DEFENDANTS' STATUS REPORT**

1. Defendants' submit this Status Report in advance of the status conference set for January 10, 2008 to balance the report submitted by Plaintiff, which appears to be more a motion asking for a discovery order than it is a report on the status of what were supposed to be settlement discussions.

**Background**

2. On December 7, 2007, this Court denied Plaintiff's motion for a temporary restraining order, although it ordered "Defendants …to preserve information contained on personal computers, and to create mirror images of the contents within 21 days." Defendants have complied with this order by retaining Project Leadership Associates ("PLA") to make forensic quality mirrors of all of their personal computers, as well as any Blackberry devices and/or external hard drives that they owned or possessed during the relevant time-period.

3. On or about December 10, 2007, counsel for Defendants called Plaintiff's counsel and stated that, although Defendants were prepared to litigate, and would be asserting and vigorously pursuing several counterclaims if the litigation continued, Defendants would much prefer to begin discussing settlement.

4. On or about December 11, 2007, Defendants' counsel received a call from Plaintiff's counsel in which Plaintiff's counsel proposed that the parties agree to a stay of proceedings in this Court and in the arbitration Plaintiff simultaneously filed with the American

Arbitration Association an order to engage in a limited exchange of information and settlement negotiations. Defendants welcomed this suggestion and the parties negotiated an agreement that provided for exchanging documents and reaching an agreement on searching Defendants' electronic data. Plaintiff's counsel then undertook to consult with the office of this Court to advise it of the parties' agreement. As a result, the Court issued its December 17, 2008 order staying discovery until January 10, 2008, at which time the parties were to appear to report on the status of their settlement negotiations.

**Summary**

5. There have been no substantive settlement discussions. Although Defendants, through counsel, have requested on several occasions that Plaintiff provide it with a settlement proposal or an outline of a potential structure for a settlement, Plaintiff has responded in only the most general terms and deflected or refused Defendants' requests that concrete, even if not specific, settlement parameters be discussed.

6. Plaintiff instead has been willing to discuss only procedures for "investigating" Defendants electronic data. Defendants have not "thwarted" this discussion or the purpose of any order or agreement. Indeed, Defendants stand ready to allow any reasonable search and analyses of their electronic data. The parties' current disagreement does not concern whether their electronic data should or will be searched and analyzed but, rather whether such searches and analyses should be accomplished by turning over copies of the mirrors to Plaintiff so that its attorneys and experts can search and analyze the data based on the broad, general and vague "protocol" proposed by Plaintiff or should be conducted by Defendants' expert according to an appropriate, specific and detailed protocol to be specified by Plaintiff subject to Defendants right to object to any unreasonable provisions. (See Declaration of John Evans, attached hereto as Exhibit A.) The mirrors that Plaintiff seeks to have turned over to it, with little or no real controls, contain more than terabytes of data (a terabyte equals 1,000 gigabytes ), some of which is attorney-client privileged and the vast majority of which is wholly personal or otherwise irrelevant to the parties' disputes.

**Details of the Parties discussions**

7. Upon the issuance of the December 17 Order, Plaintiff served an extensive set of broad document requests on Defendants, including requests that were nonsensical in light of

the nature of Plaintiff's business.[*] (A copy of Plaintiff's Document Requests is attached as Exhibit B hereto.) Defendants' counsel discussed its concern about the scope of the requests with Plaintiff's counsel, indicating that they seemed to be calculated to broaden the dispute rather than facilitate settlement discussions. Plaintiff's counsel provided their assurances that that had not been the intention and agreed to certain limitations on the requests. Defendants' counsel then suggested that a conference call be scheduled with counsel and their respective experts to discuss a procedure for the production/examination of the electronic data on the mirrors.

8. Subsequently, Plaintiff's counsel called to schedule a conference among attorneys, indicating that they did not believe that the experts should participate in this initial conference. At this conference, Defendants' counsel suggested that Plaintiff specify the search terms that they wished to have used to search the mirrors and any other analyses that they wished to have done and, assuming that the terms and analyses suggested were reasonable, Defendants would arrange to have its expert execute the searches and analyses and that Plaintiff could have its expert observe. Plaintiff's counsel indicated that this would be difficult because their expert was California based and asked that its expert be allowed to conduct the analyses.

9. Defendants' counsel indicated that it had some concerns about such a procedure because there were large amounts of data on the mirrors, some of which was attorney-client privileged information and the vast majority of which was personal or otherwise wholly irrelevant in nature. Nonetheless, Defendants' counsel indicated that turning copies of the mirrors to plaintiff's expert would be considered provided a specific protocol was developed and agreed to that provided adequate assurances that the integrity of Defendants' privileged and personal data would not be compromised.

10. Defendants' counsel also stressed that it regarded simply turning over copies of

[*] Several of the requests, for example, requested documents relating or referring to "customers" of the Plaintiff. As Plaintiff's counsel conceded in subsequent discussions, Plaintiff has no identifiable "customers". Plaintiff is primarily an options market maker on a number of securities exchanges. It buys and sells options on various underlying securities for its own account in the general marketplace. The corresponding buyers or sellers are largely anonymous and in no way have any kind of customer relationship with Plaintiff. In fact, given its current regulatory registration, Plaintiff is prohibited from having customers.

mirrors containing so much data that Plaintiff's had no right or legitimate interest in seeing or examining would be an extra-ordinary step and was only being considered as a way to build trust in order to promote engaging in productive settlement discussions. It was also stressed that the protocol had to be detailed enough and provided in advance so that Defendants' experts could run parallel searches and analyses as a control and obtain the advice of their expert concerning the reasonableness of the protocol as Defendants' counsel did not regard themselves as experts in the forensic examinations of electronic data. One of Plaintiff's counsel indicated that he had experience with such undertakings and would undertake drafting a protocol.

11. Several discussions took place thereafter and several draft protocols were exchanged. Certain of the concerns raised by Defendants' were never addressed in the protocols proposed by Plaintiff's counsel, including a date range limitation and provisions for identifying and excluding privileged information from the search and review process. Despite several requests, Plaintiff's counsel never provided a list of search terms to be used and provided in the protocol that such a list would not be provided until after the mirror copies were in Plaintiff's expert's possession. The protocol also provided that Plaintiff's attorneys and expert could conduct an otherwise unspecified analysis "using general forensic techniques" in addition to the word searches that were the only analysis that had been expressly discussed in our conversations.

12. Even more troubling from Defendants' viewpoint was that every attempt to introduce the issues of concern to them, i.e., the parameters of a settlement agreement, Plaintiff's specific intentions with respect to the approximately $2.5 million due to Defendants in deferred compensation and for the repurchase of their equity interest, etc., into the discussion were deflected or otherwise ignored. Plaintiff's counsel also made comments such as that Plaintiff was continuing to develop evidence of wrongdoing by the defendants day-by-day, yet would not specify what this "evidence" was. As a result, Defendants' counsel became more uncomfortable with accepting any protocol that turned over control of all of their electronic data to Plaintiff, particularly in the absence of any actual discussion of settlement.

13. On January 2, 2008, Defendants' counsel called Plaintiff's counsel and left a message that they would like to discuss the status of the parties' discussions. The next day, January 3,

2008, Plaintiff's counsel returned the call and Defendants' counsel expressed their concerns. Specifically, Defendants' counsel stated that they believed that agreeing to turn over raw copies of the mirrors was not something that any court or arbitration panel would require them to do and that it was being considered only in the context of promoting a settlement that was not being discussed. They asked that Plaintiff provide them with concrete information concerning what they thought a settlement should include. Again, Defendant's requests for information were deflected and Plaintiff's counsel were willing to discuss only when we would be providing them with comments on their suggested protocol and when they would receive copies of the mirrors.

14. Shortly after this conversation, Defendants' counsel called another of Plaintiff's counsel who had participated in the initial conversation proposing that the litigation and arbitration be stayed to facilitate settlement but who had not been involved in any of the parties' subsequent conversations. Defendants' counsel left a message explaining that they were concerned that the parties' discussions seemed to be getting off track, that they had understood that the parties would be engaging in a cooperative process calculated to result in a settlement but that did not appear to be what was happening, and asking that he return the call to discuss whether Defendants' counsel had misunderstood their initial conversation and, if not, how settlement discussions could get back on track. This call was not returned. Late on the afternoon of January 4, Defendants' counsel did receive an email asking when Plaintiff would receive Defendants' comments on the proposed protocol. Defendants' replied that they would respond by Monday morning (January 7, 2008).

15. On January 7, 2008, Defendants' counsel sent an email to Plaintiff's counsel stating that Defendants were unwilling to turn over copies of the mirrors to Plaintiff's in light of the lack of any substantive settlement discussions but would arrange to have their expert search their electronic data using up to ten search terms specified by Plaintiff as soon as Plaintiff provided a list of search terms to be used. The email also indicated that Plaintiff's expert could consult with Defendant's' expert concerning the search methods to be used and that Defendants would commit to conferring within two days of the generation of a report on the search to consult whether additional searches were necessary. A copy of this email is attached as Exhibit E to Plaintiff's Status Report.

16. On January 7, 2008, Defendants' counsel received a letter from Plaintiff's counsel objecting to Defendants' proposal in general and specifically to the limitation of 10 search terms, the failure to provide for analyses to determine whether data had been "wiped" or other electronic storage devices had been connected to the computers that were mirrored, and the failure to provide for the possibility of additional searches in light of what the first searches found. The letter demanded an "appropriate response" by 12:00 pm "California time" on January 8, 2008. A copy of this letter is attached as Exhibit F to Plaintiff's Status Report.

17. On January 8, 2008, at 1:43pm CST (11:43 am "California time"), Defendants' counsel emailed a letter to Plaintiff's counsel in response, indicating that Defendants were willing to negotiate a greater number of search terms provided it was informed what search terms were being proposed, that the January 7 email had indicated that additional searches of the electronic data might be necessary depending on the results of the first search and that Defendants were agreeable to having "wiping" and storage device attachment analyses performed by their expert. A copy of this letter was not attached to Plaintiff's Status Report, but is attached hereto as Exhibit C.

**Conclusion**

18. Defendants request that a settlement conference be scheduled with this Court or a magistrate in an effort to resolve all of the parties' disputes, including those regarding the appropriate procedure for searching and analyzing Defendants' electronic data. Defendants believe that the parties would benefit from the Court's involvement in such discussions.

s/Charles J. Risch
One of Defendants' Attorneys

John D. Ruark
Charles J. Risch
Lawrence, Kamin, Saunders & Uhlenhop, LLC
300 South Wacker Drive, Suite 500
Chicago, Illinois 60604
(312) 372-1947
Facsimile: (312) 222-0818
crisch@lksu.com
*Attorneys for Defendants,*

*Lauren DeLuca, Lawrence Spieldenner, John Superson and Stanton Todd*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that he caused true and correct copy of the attached Defendants' Status Report to be served upon the following:

Daniel A. Kaufman
Laura Shroyer Liss
**MICHAEL BEST**
Two Prudential Plaza
180 North Stetson Avenue
Suite 2000
Chicago, IL 60601-6710

via electronic filing on January 9, 2008.

s/Charles J. Risch